2023 JAN -3 PM 1:55

| | |
|---|---|
| DR. BART ADAMS, JR, and JOSEPHINE ADAMS as parents of BRIAN ADAMS, deceased; and DR. BART ADAMS, JR, and JOSEPHINE ADAMS individually; and DR. BART ADAMS, JR, as the Personal Representative of the Estate of Brian Adams, Pro Se, | ) ) ) ) ) ) ) ) ) ) Civil Action No. _____ ) ) District Judge: ) ) Magistrate Judge: ) Plaintiffs, ) **JURY TRIAL DEMANDED** ) ) vs. ) ) ) VANDERBILT UNIVERSITY, ) VANDERBILT UNIVERSITY'S ) BOARD OF TRUST, CHANCELLOR ) DANIEL DIERMEIER and DOES 1- ) 200 ) |

Defendants

## COMPLAINT IN CIVIL ACTION

Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1. This action involves the wrongful death of Vanderbilt University undergraduate student Brian Adams ("Brian").

2. On July 4, 2021, after Brian was intentionally left hanging by his neck in his dorm room at Vanderbilt University for approximately 20 hours. Brian was finally pronounced dead by

the medical examiner at 8:03 PM on July 4, 2021. In the previous eight months Brian attempted suicide twice in his dorm room at Vanderbilt University and was under the care of an unlicensed therapist at Vanderbilt University.

3. On information and belief, on or about July 4, 2021, Vanderbilt University's Residential Advisor Heng Sun was Brian's Resident Advisor ("RA"). After two previous suicide attempts in his dorm room Brian's residential adviser Heng Sun duty and responsibility on July 4, 2021 was to perform suicide prevention checks on Brian. Heng Sun intentionally failed to perform suicide prevention checks on Brian.

4. On information and belief, although Brian's health was deteriorating, along with the known increased risk of suicides over holidays, Brian's unlicensed therapist Stephanie Singer at Vanderbilt University's University Counseling Center ("UCC") intentionally decided to wait until after the July 4th, 2021 holiday weekend when scheduling the coordination of Brian's care with Vanderbilt University Office of the Student Care Coordinator.

5. Prior to Brian's death in his dorm room on July 4, 2021, Vanderbilt University allowed Brian's girlfriend, that is, after she was released from Vanderbilt Psychiatric Hospital (VPH) for attempted suicide, to move into Brian's dorm room in May 2021.

6. Allowing two students who were both recently released from Vanderbilt University Psychiatric hospital for attempted suicide to **live together** on the fifth floor of Vanderbilt University Lewis House Rm 521, a dorm room with large open windows, is an example of how two young vulnerable undergraduate students who already attempted suicide were recklessly treated and intentionally neglected by Vanderbilt University and its unlicensed therapist. Brian ended up dead in Rm 521 and his girlfriend back to Vanderbilt Psychiatric Hospital.

7. Brian first attempted suicide took place on the day after his November 12, 2020 in-person visit at Vanderbilt's UCC.

8. Upon information and belief, Vanderbilt's unlicensed therapist Stephanie Singer knew Brian was suicidal on November 12, 2020, because Brian reported he was suicidal to Stephanie Singer on November 12, 2020 during an in-person visit at Vanderbilt's UCC with Stephanie Singer on November 12, 2020. The purpose of the in-person visit on November 12, 2020 was because Brian did not want to die by suicide and wanted help from Vanderbilt's UCC. Nonetheless, Stephanie Singer did not initiate Vanderbilt University suicide prevention protocol which includes calling 911 for help.

9. On November 12, 2020, Stephanie Singer instead of calling 911 for help or sending Brian across the street to the ER for observation, Stephanie Singer intentionally instructed Brian to complete his move into E. Bronson Ingram, intentionally left Brian alone, intentionally waited until the following day, that is, November 13, 2020 for a zoom visit. During Brian's in-person visit on November 12, 2020 unlicensed therapist Stephanie Singer asked Brian to wait a day before he killed himself. Brian agreed and Stephanie Singer scheduled Brian for a zoom visit from his dorm room located in E. Bronson Ingram College.

10. On November 13, 2020, Brian spoke to the unlicensed therapist, Stephanie Singer via a Zoom meeting and reported new suicidal thoughts that started after Brian's in-person visit with Stephanie Singer at the UCC on November 12, 2020.

11. Upon information and belief during the November 13, 2020 zoom visit with unlicensed therapist Stephanie Singer, the unlicensed therapist Stephanie Singer encouraged Brian to commit suicide as a sign of love, while she and at least one coworker at Vanderbilt's UCC

Case 3:23-cv-00001   Document 1   Filed 01/03/23   Page 3 of 41 PageID #: 3

**watched on zoom as Brian attempted suicide by hanging himself in his dorm room at E. Bronson Ingram College** dorm room located on the second floor of E. Bronson Ingram College.

12. Upon information and belief during the November 13, 2020 Zoom visit, the unlicensed therapist Stephanie Singer encouraged Brian to commit suicide as a sign of love, while she and at least one coworker at Vanderbilt's UCC **watched on zoom as Brian attempt suicide by hanging himself in his dorm** room at E. Bronson Ingram College dorm room located on the second floor of E. Bronson Ingram College.

13. Upon information and belief instead of immediately calling 911 for help during the November 13, 2020 Zoom visit, the unlicensed therapist Stephanie Singer, and Vanderbilt employees at E. Bronson Ingram College waited until the following day, i.e., November 14, 2020, before Vanderbilt Police were telephoned.

14. Newly minted high school graduates are directed to Vanderbilt's UCC for Zoom treatment by an unlicensed therapist for the most serious and life-threatening emotional traumas.

15. At all relevant times Vanderbilt offered it courses throughout the Unites States via Zoom.

16. The acts and failure to act by the Defendant Vanderbilt University, Defendant Board of Trust and Chancellor Daniel Diermeier constituted despicable conduct, gross negligence, intentional, willful, wanton, reckless, conscious, deliberate, aggravated, outrageous, malicious, oppressive, with reprehensible disregard of risk that presents a high degree of probability that substantial harm will result and with complete indifference, for the interests, rights, plight, misfortune, disability, weakness, safety, known risk of death or known risk of grave bodily injury.

17. Vanderbilt took advantage of Brian's weakness and condition and failed to take steps to prevent Brian's death. Defendants voluntarily assume care but was indifferent to the risk posed by the previous suicide attempts of undergraduate Vanderbilt University student, Brian Adams, deceased. Vanderbilt knew Brian already attempted suicide twice and knew Brian was overtly suicidal, nonetheless after assuming care on or about November 12, 2020, Vanderbilt intentionally took no steps to prevent Brian's death on campus. Vanderbilt took advantage of Brian and assigned an unlicensed therapist to provide care and coordinate Brian's care.

18. On information and belief, Vanderbilt's UCC prescribed medicines to Brian that are known to cause brain damage, without scientific evidence that the dangerous medicines actually help. Vanderbilt either creates, and/or triggers; and/or exacerbate; and/or aggravates a disability, than discriminates against a student with a disability.

19. Vanderbilt took steps to avoid liability by concealing and/or destroying and/or blocking the release of security videos, school records, health records, academic transcripts, intake forms, incident reports, e-mail, phone records and Vanderbilt University police records.


**JURISDICTION & VENUE**

20. This Court has jurisdiction over the subject matter presented by this Complaint under 28 U.S.C. §§ 1331 and Under 28 U.S.C. § 1332 the amount of damages is more than $75,000. This is a diversity of citizenship case.

21. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

22. Plaintiff, Dr. Barton Adams, Jr. and Josephine Adams husband and wife are adult residents of Commonwealth of Virginia.

23. Plaintiff Dr. Bart Adams, Jr. and Josephine Adams are the parents of Brian Adams deceased.

24. Plaintiff Dr. Bart Adams, Jr., is the administrator of the estate of Brian Adams.

25. At all relevant times, Brian Adams was an undergraduate student at Vanderbilt University, informally known as a *Southern Ivy League* academic institution.

26. Defendants, Board of Trust. Vanderbilt University "Board of Trust" governs Vanderbilt University. The Board of Trust includes but is not limited to: (i) Bruce R. Evans, Boston Massachusetts; (ii) Jeffrey J. Rothschild, Palo Alto, California; (iii) Nora Wingfield Tyson, Oro Valley, California; (iv) Steven H. Madden Sr, Houston, TX; (v) Makeba Williams Boatwright, MD, Madison, Wisconsin; (vi) Mark P. Mays, San Antonio, TX (vii) Shirley M. Collado PhD, Oakland, CA; (viii) Sean Connolly, Winnetka, Illinois; (ix) L. Lawrence Epstein, Las Vegas Nevada; (x) Adena T. Friedman, New York, New York; (xi) Jennifer Frist, Nashville, TN (xii) Jay C. Hoag, Menlo Park, CA; (xiii) Andrew Hoine, New York, New York; (xiv) George B. Huber, Bellevue, Washington; (xv) Kito K. Huggins, New York, New York; (xvi) John R. Ingram, Nashville, Tennessee; (xvii) Justin Ishbia, Chicago, Illinois; (xviii) Kathleen Justice-Moore, Palo Alto, California; (ixx) Suzanne Perot McGee; (xx) Robert M. Levy, Richmond Hill, Georgia; (xxi); W. Dougal Parker, Fort Worth TX.; (xxii) David W. Patterson, Washington, DC; (xxi) Robert C. Schiff, Jr., MD, Cincinnati, OH; (xxii)Conner Searcy, Dallas, TX; (xxiii) Alexander C. Taylor, Atlanta, GA; (xxiv) Corey E. Thomas, Boston, MA; (xxv) Timothy L. Warnock, Nashville,

TN; Mark Wilf, Short Hills, NJ; Kenya Wright, Brooklyn, NY.

27. Defendant, Chancellor Daniel Diermeier. The Chancellor was elected by the Board of Trust and is the chief executive officer of the university.

28. Defendants, Vanderbilt University. Vanderbilt University is a corporation and/or legal entity organized and existing under the laws of the State of Tennessee. At all relevant times offered online courses to students living at home in all fifty states. Similar to other large corporations, Vanderbilt does business in most if not all states and has effectively used zoom for its online business in all states.

29. G.L. Black, is the associate provost and dean of students. Black's previous experience at Vanderbilt also includes recruiting for hire unlicensed therapist, overseeing the operations of the Student Care Network, including the Center for Student Wellbeing, the Office of Student Care Coordination and the University Counseling Center, as well as the operations of the Office of Student Accountability, Community Standards and Academic Integrity.

30. Black is the chair of the Campus Assessment, Response and Evaluation (CARE) Team and Welfare Panel to support students of concern and has served on the Chancellor's Strategic Planning Committee on Mental Health and Wellbeing.

31. Plaintiff is ignorant of the true names and/or capacities of the defendants sued as DOES 1 through 200, inclusive, and therefore Plaintiff sues these Defendants by such fictious names. Following further investigation and discovery, Plaintiff will seek leave of this court to amend his Complaint to allege, their true name and capacities when ascertained. These fictitiously named Defendants are responsible in some manner for the acts, occurrences, and events alleged herein. These defendants aided and abetted and/or conspired with the named Defendants in the wrongful acts and courses of conduct or otherwise negligently

caused the damages and injuries herein and are responsible in some manner for the acts, occurrences, and events alleged in this complaint.

32. At all relevant times, Vanderbilt University owned, operated, controlled, and did business as Vanderbilt University throughout the United States using Zoom, also known as "Vanderbilt." (From here forward, Vanderbilt University will be referred to as "Vanderbilt" or "University").

33. At all relevant times, Vanderbilt formulated, and enacted multiple programs and resources focused on helping its students manage academic stress and situational crises.[1] Among these programs and resources were the University Counseling Center, known and hereafter referred to as "UCC". UCC provides a flexible and culturally responsive model of service that focuses on mental health and wellbeing. The services offered are specific and tailored treatment plans, and referrals are developed for each client.[2]

34. UCC is set up so that students in crisis can receive time limited and responsive care which includes individual psychotherapy, psychiatric services/medication management, urgent care counseling, trauma informed care, psychological assessment, alcohol and other drugs assessment and consultation, eating disorder assessment and consultation, group psychotherapy, and sports performance and mental health.

35.     Upon information and belief, either prior to or upon Brian's arrival at Vanderbilt in the fall of 2018, Vanderbilt notified him of the services offered by UCC, through the

---

[1] See Vanderbilt Student Affairs, University Counseling System, found at https://www.vanderbilt.edu/ucc/services/
[2] *Id.*

Vanderbilt Student Affairs Department.

**36.** At all relevant times, Vanderbilt acted by and through its employees, servants, agents, contractors, subcontractors, and staff, including those physicians, social workers and other clinicians who provided treatment and care to students seeking services at UCC, as well as those faculty and academic advisors who provided students with advice and assistance regarding course load, withdrawal from classes and/or leaves of absence. At all relevant times, all employees, servants, agents, contractors, subcontractors, faculty, and staff acted with actual, apparent and/or ostensible authority and within the course and scope of their employment or affiliation with Vanderbilt.

**37.** At all relevant times, Vanderbilt by and through its executives, directors, program administrators, senior management and/or other administrators, employees, servants, agents, contractors, subcontractors and/or staff were responsible for the establishment, oversight and operation of UCC, the Student Health Service and/or the Academic Services and for the hiring, training, supervision and retention of those individual's providing services through UCC, the Student Health Service and Vanderbilt Student Affairs. Among these executives, directors, program administrators, senior management and/or other administrators, employees, health care providers, unlicensed therapist, servants, agents, contractors, subcontractors and/or staff who provided services to undergraduate student Brian Adams during relevant time include **Stephanie Singer; Viviana Grice; Lisa Clapper; Hannah Clark; Grace Moon; Adriana Kipper-Smith; Kristina Roeber; Dean Andrea Hearn; Zanetti Williams; Stephanie Fall, MD; Michael Hopkins; Melissa Porter; Matias Massaro; and Bhupendra Rajpura, MD.**

38. On information and belief **G.L. Black**, is the associate provost and dean of students and was an **accessory** after the death of Brian Adams and is involved or directed destructiono or concealment of evidence, including security videos and UCC records, in order to conceal the wrongfulness of Brian's death. Brian's death has not yet been ruled as involuntary homicide or homicide

39. Andrea Hearn, Assistant Dean of Undergraduate Education. Dean Andrea Hearn breach her responsibilities and duties to Brian regarding a leave of absence and disability accommodations. Dean Hern, increased Brian's academic course work to intentional increase stress on Brian and the likelihood of suicide.

40. At all relevant times, Vanderbilt by and through its executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, including but not limited to those individuals identified above, oversaw those individuals' providing services by and through UCC. Additionally, Vanderbilt, by and through these or other executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, formulated and enacted policies governing the operation of UCC.

41. At all relevant times, Trustees by and through its executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, including but not limited to those individuals identified above, oversaw those individuals' providing services by and through UCC. Additionally, Vanderbilt, by and through these or other executives, directors, program administrators, senior management and other administrators,

employees, servants, agents, contractors, subcontractors and/or other staff, formulated and enacted policies governing the operation of UCC.

42. Vanderbilt University's systemic **discrimination** against Brian because of his mental health disabilities, in violation of the Americans with Disabilities Act ("ADA"), 42U.S.C. § 12182, *et seq.*; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), *et seq.*; the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"). Vanderbilt did not provide reasonable accommodations and intentional left a suicidal student alone. If a live in aid was not possible, from a minimum wage employee, than for Brian's safety and the safety of other students Braine should not have been allowed to live on campus unless reasonably accommodated and cleared by a license health care professional.

43. Vanderbilt offers undergraduate and graduate academic programs that are highly competitive and consistently rated among the top in the country.

44. For decades, Defendants Vanderbilt University and the President and Board of Trust (collectively "Vanderbilt") have treated unequally and failed to accommodate students with mental health disabilities, including by modifying policies,[1] in violation of federal law.

45. Vanderbilt's withdrawal policies and practices push students with mental health disabilities out of Vanderbilt, impose punitive consequences on students who have withdrawn, and place unreasonable burdens on students who, after a withdrawal, seek reinstatement.

46. Vanderbilt also imposes on all students, regardless of disability, requirements that make it almost impossible to attend the university for any less than full-time enrollment and

Case 3:23-cv-00001   Document 1   Filed 01/03/23   Page 11 of 41 PageID #: 11

refuses or makes it unreasonably difficult to secure accommodations for disabilities in coursework or housing.

47. The impact of Vanderbilt's discriminatory policies is harshest on students with mental health disabilities from less privileged backgrounds, including students of color, students from poor families or rural areas, and international students.

48. Vanderbilt's discriminatory policies leave students with mental health disabilities from less privileged backgrounds at risk of losing their health insurance coverage. They have no option to continue coverage when they withdraw, despite their need to attend to their mental health disability.

---

[1] The terms "accommodate" or "accommodations," as used herein, include making modifications to policies, practices, and procedures.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

49. The averments of the preceding paragraphs 1-48 are incorporated herein by reference as though fully set forth at length.

50. At all relevant times, Vanderbilt University owned, operated, controlled, and did business as Vanderbilt University, also known as "Vanderbilt." (From here forward, Vanderbilt University will be referred to as "Vanderbilt" or "University.")

51. At all relevant times, Vanderbilt formulated, and enacted multiple programs and resources

focused on helping its students manage academic stress and situational crises.[3] Among these programs and resources were the University Counseling Center, known and hereafter referred to as "UCC".

52. UCC provides a flexible and culturally responsive model of service that focuses on mental health and wellbeing. The services offered are specific and tailored treatment plans, and referrals are developed for each client.[4]

53. UCC is set up so that students in crisis can receive time limited and responsive care which includes individual psychotherapy, psychiatric services/medication management, urgent care counseling, trauma informed care, psychological assessment, alcohol and other drugs assessment and consultation, eating disorder assessment and consultation, group psychotherapy, and sports performance and mental health.

54. Upon information and belief, either prior to or upon Brian's arrival at Vanderbilt in the fall of 2018, Vanderbilt notified him of the services offered by UCC, through the Vanderbilt Student Affairs Department.

55. At all relevant times, Vanderbilt acted by and through its employees, servants, agents, contractors, subcontractors, and staff, including those physicians, social workers and other clinicians who provided treatment and care to students seeking services at UCC, as well as those faculty and academic advisors who provided students with advice and assistance regarding course load, withdrawal from classes and/or leaves of absence. At all relevant

---

[3] See Vanderbilt Student Affairs, University Counseling System, found at https://www.vanderbilt.edu/ucc/services/

[4] *Id.*

times, all employees, servants, agents, contractors, subcontractors, faculty, and staff acted with actual, apparent and/or ostensible authority and within the course and scope of their employment or affiliation with Vanderbilt.

56. At all relevant times, Vanderbilt by and through its executives, directors, program administrators, senior management and/or other administrators, employees, servants, agents, contractors, subcontractors and/or staff were responsible for the establishment, oversight and operation of UCC, the Student Health Service and/or the Academic Services and for the hiring, training, supervision and retention of those individual's providing services through UCC, the Student Health Service and Vanderbilt Student Affairs. Among these executives, directors, program administrators, senior management and/or other administrators, employees, servants, agents, contractors, subcontractors and/or staff.

57. At all relevant times, Vanderbilt by and through its executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, including but not limited to those individuals identified above, oversaw those individuals' providing services by and through UCC. Additionally, Vanderbilt, by and through these or other executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, formulated and enacted policies governing the operation of UCC.

58. At all relevant times, Trustees by and through its executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, including but not limited to those individuals

identified, supra, oversaw those individuals' providing services by and through UCC. Additionally, Vanderbilt, by and through these or other executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, formulated and enacted policies governing the operation of UCC.

59. Brian Adams ("Brian") was Born in Dallas, Texas, in 1999.

60. From an early age, Brian was an exceptional student and athlete. Brian was admitted into eight highly regard Universities and chose to attend Vanderbilt in the Fall of 2018.

61. Brian was on track to graduate at the end of four years as a member of the Class of 2022.

62. In addition to Brian's stellar effort to attain good grades prior to his death, Brian was an active member of the student service organization Circle K International, The Vanderbilt Review, The Vanderbilt Historical Review, The Vanderbilt Fencing Club, and worked for the Central Library. Additionally, Brian was an active participant in various performing arts groups, including Vanderbilt Off-Broadway, Vanderbilt University Theatre, and the Iceberg Theater Company.

63. In the Spring of 2020, and at the height of the COVID pandemic, Brian Adams studied from home as Vanderbilt was essentially closed for students due to the pandemic. Brian's thrived at home his grades were mostly A grades, and he was effectively able to excel from home during the pandemic.

64. On or around November 10, 2020, that is, during the latter part of the fall 2020 semester.

Brian suffered a relationship break-up with his girlfriend, and subsequently moved from their off- campus shared apartment.

65. Brian was a student at Vanderbilt University for about 818 days, **before** Brian made his first appointment with Vanderbilt UCC on or around for November 12, 2020, as Brian needed some help organizing his thoughts regarding the break-up with his girlfriend and vocalized to an unlicensed therapist at UCC that he was considering suicide.

66. On or around November 12, 2020, Brian although reporting his suicidal ideation to an unlicensed therapist at Vanderbilt's UCC, the unlicensed therapist allowed Brian a suicidal student at Vanderbilt to be alone. The unlicensed therapist took no steps to make sure Brian was not alone, such as transferring Brian to the Emergency Room across the street to be observed by licensed professionals until Brian's parents were notified. Vanderbilt has no on-campus infirmary. Instead of calling 911 for help with the care of a suicidal student, the unlicensed therapist at Vanderbilt's UCC named, Stephanie Singer, allowed Brian to move **alone** into Vanderbilt dormitories in E. Bronson Ingram College and scheduled a zoom visit with the same unlicensed therapist at UCC for the following day.

67. Vanderbilt UCC did not notify Brian's emergency contacts. Vanderbilt claim that HIPPA, only allows Vanderbilt to notify parents to pick up their dead child's body from a dorm room or morgue. The student's health is not the "emergency," the emergency for the use of emergency contact information is what to do with a deceased student's body in his or her dorm room at Vanderbilt University.

68. Vanderbilt UCC did not contact Vanderbilt's Student Care Coordinator to coordinate Brian's care before allowing Brian, an overtly suicidal student, requesting help because he

did not want to die to move **alone** into a dorm room at Vanderbilt's, E. Bronson Ingram College on or about November 12, 2020.

69. A Faculty Head of College leads E. Bronson Ingram College. The Faculty Head works closely with Residential Colleges staff, a graduate student worker, and the College Programming and Advisory Councils to encourage the living and learning outside of the classroom. The residents are also supported by an Area Coordinator, a Head Resident, and Resident Advisers who all live in the college.5 All records of Brian's interactions with Vanderbilt employees at E. Bronson Ingrams has been either destroyed or are being concealed to conceal liability.

70. To avoid liability, Vanderbilt's associate Provost and Dean of Students G.L. Black and Vanderbilt's in-house counsel Michele Tellock are still refusing to identify the names of any of its employees at E. Bronson Ingram College or turn over any records related to Brian's suicide attempt in E. Bronson Ingram College on November 13, 2020.

71. On November 12, 2020, the unlicensed therapist, Stephanie Singer at Vanderbilt, specifically, at the UCC, accepted Brian as a patient, and asked Brian to wait until the following day to do anything to harm himself until they can have a zoom interview on November 13, 2020. In doing so, the unlicensed therapist violated the rule when caring for a patient with suicidal thoughts, never to leave a suicidal person **alone**.

72. Vanderbilt University does not have a campus infirmary. Stephanie Singer did not call 911, a routine part of any suicide prevent protocol or have Brian transferred to the Emergency

---

[5] E. Bronson Ingram College, accessed at https://www.vanderbilt.edu/ohare/e-bronson-ingram-college/

Room across the street for observation. Instead, unlicensed therapists Stephanie Singer allowed Brian an overtly suicidal student to complete his moved into the dorm named E. Bronson Ingram College and remain alone.

73. Although it is highly unusual for a student to move into E. Bronson Ingram college dorms, it should be unheard of to allow an overtly suicidal student to move to campus housing unless cleared by a licensed health care provider. In addition, the Faculty Head of E. Bronson Ingram College, the Residential Colleges staff, the graduate student worker, the Area Coordinator, the Head Resident, and the Resident Advisers who all live in the college did not check on Brian or initiate a suicide prevent protocol.

74. On November 12, 2020 Brian went in-person to Vanderbilt's UCC for help. Upon information and belief, Vanderbilt's unlicensed therapist Stephanie Singer knew Brian was suicidal on November 12, 2020, because Brian reported he was suicidal to Stephanie Singer on November 12, 2020 during an in-person visit at Vanderbilt's UCC with Stephanie Singer. The purpose of the in-person visit on November 12, 2020 was because Brian did not want to die by suicide and wanted help from Vanderbilt's UCC.

75. On November 12, 2020, Stephanie Singer instead of calling 911 for help or sending Brian to the ER for observation, Stephanie Singer intentionally instructed Brian to complete his move into E. Bronson Ingram, intentionally left Brian alone, intentionally waited until the following day, that is, November 13, 2020 for a zoom visit. On November 12, 2020 unlicensed therapist Stephanie Singer asked Brian to wait a day before he killed himself. Brian agreed and Stephanie Singer scheduled Brian for a zoom visit from his dorm room located in E. Bronson Ingram College.

76. On November 13, 2020, Brian spoke to the unlicensed therapist, Stephanie Singer via a Zoom meeting and reported new suicidal thoughts that stated after Brian's in-person visit with Stephanie Singer at the UCC on November 12, 2020.

77. Upon information and belief during the November 13, 2020 zoom visit with unlicensed therapist Stephanie Singer, the unlicensed therapist Stephanie Singer encouraged Brian to commit suicide as a sign of love, while she and at least one coworker at Vanderbilt's UCC watched on zoom as Brian attempt suicide by hanging himself in his dorm room at E. Bronson Ingram College dorm room located on the second floor of E. Bronson Ingram College.

78. Upon information and belief instead of immediately calling 911 for help during the zoom visit the unlicensed therapist Stephanie Singer, at least one other UCC employee and Vanderbilt employees at E. Bronson Ingram College waited until the following day, i.e., November 14, 2020, before Vanderbilt Police were telephoned.

79. Although the Vanderbilt police arrived on November 14, 2020, to find that Brian was alive but had belt burn marks around his neck from his failed suicide attempt, the Vanderbilt Police Incident report although logged into their computer system, the incident report for November 14, 2020 is now **missing**. The require government record retention laws apparently were intentionally violated to help Vanderbilt escape liability for the death of one of its undergraduate students Brain Adams.

80. On November 13, 2020, after this call and after reporting new suicidal thoughts to unlicensed therapist Stephanie Singer, Brian attempted suicide by hanging himself. Though UCC knew of his suicidal thoughts, they did not observe him or contact authorities after

Brian the attempted suicide occurred. At a minimum, UCC should have initiated an obvert and obvious suicide watch which is a process not clearly outlined in their suicide prevention policies.[6]

81. On November 14, 2020, the Vanderbilt University Police Department went to the E. Bronson Ingram College, removed Brian, and took him to Vanderbilt University Medical Center, Psychiatric Hospital. The Vanderbilt Police incident report for November 14, 2020, now cannot be found by the Vanderbilt Police.

82. A little over seven months later, that is, on July 4, 2021, Brian Joseph Adams' body was found after hanging for about twenty hours in his dormitory room at Vanderbilt, and his death was ruled a suspected suicide.

83. Brian's death in his dorm room occurred while being enrolled as an undergraduate student at Vanderbilt University.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT TOLLING

84. In order to avoid and conceal liability, the Defendants destroyed or are concealing security video from July 3, 2021, July 4, 2021, intake forms for Brian's initial visit to Vanderbilt's University Counseling Center (UCC). Fraudulently conceal and/or destroyed incident report for November 14, 2020. Manufactured records. Fraudulently Conceal HIPPA release forms. Denied Brian was a patient and requested help for his suicidal thoughts at

---

[6] Mental Health Resources, Vanderbilt University, accessed at https://medschool.vanderbilt.edu/explore-vusm/mental-health-resources/

UCC. Fraudulently concealed and blocked the release of Brian school records and transcripts. Defendants did not make known the omissions and inaccuracies.

## COUNT I
## NEGLIGENCE, GROSS, AND CORPORATE NEGLIGENCE

85. The averments of the preceding paragraphs 1-84 are incorporated herein by reference as though fully set forth at length.

86. As evidenced by Brian Joseph Adams availing himself of UCC Student Health, he was obviously aware of the "multiple programs and resources" designed to assist him in regaining his physical and mental health.

87. Despite availing himself of these services and the failure of Vanderbilt to provide any meaningful help, support and safety net, Brian became increasing despondent over his academic and social situation resulting in worsening anxiety, and suicidal thoughts.

    a. **In addition to two actual attempts at suicide in his door room at Vanderbilt University.** Brian was hospitalized for his November 13, 2020 suicide attempt. On no less than ten occasions Brian either told Vanderbilt's employees servants and agents or it was otherwise communicated to Vanderbilt that he was suicidal. Telephone call(s) on or about November 11, 2020 between Brian and UCC and Student Care Coordinators Office;

b. The UCC Intake form completed by Brian on or about November 11, 2020;

c. The November 12, 2020 in-person visit with Stephanie Singer an unlicensed therapist working at Vanderbilt University Counseling Center.

d. The November 13, 2020, Zoom meeting consultation with UCC;

e. The November 14th consultation with Vanderbilt University Police Department;

f. The November – December hospitalization at Vanderbilt Psychiatric Hospital.

g. December partial hospitalization at Vanderbilt Psychiatric Hospital.

h. Between November 12, 2020 and July 4, 2021, **Brian attempted suicide in his dorm room on two (2) separate occasion.**

i. Vanderbilt has not identified Brian's Case Manager or turned over the Case Manager Records.

88. Short of wearing a neon sign that he planned to commit suicide, Brian was all but begging Vanderbilt for help and attempted suicide twice, the first by hanging and the second by cutting his wrist. Appallingly, Vanderbilt did not just fail him, and **failed to take any steps** to protect Brian from self-harm Vanderbilt University employees, intentionally and/or involuntarily killed Brian.

89. Beginning as early as November 11, 2020 and continuing through Brian's death in his dorm room on July 4, 2021, each and every Vanderbilt physician, mental health professional and Student Affairs Representative from whom Brian sought help had a duty to ensure his safety and wellbeing and protect him from harm.

90. Beginning on or about November 12th 2020 and continuing until his death on July 4, 2021

the Vanderbilt professionals from whom he sought help knew or should have known that because of two suicide attempts in his dorm room, and his fixation with suicide, Brian was incapable of maintaining proper perspective or making sound decisions regarding his own health, safety, and wellbeing.

91. The failure of these multiple professionals, all of whom were employed by or affiliated with Vanderbilt and working on its behalf, to take adequate and proper precautions or preventative measures to adequately treat Brian and protect him from harm during a period when they knew he articulated suicidal thoughts and plans or in the exercise of due care should have known that he was suicidal and that he was incapable of maintaining proper perspective and making sound decisions regarding his health, safety and wellbeing.

92. The general, gross, and corporate negligence of Vanderbilt as it pertains to Brian, consists of one or more of the following acts or omissions:

    a. failing to provide outreach and support programs regarding student psychological wellbeing that complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

    b. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

    c. failing to hire, retain and ensure that the persons providing the services

offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of and complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

d.  failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Joseph Adams were aware of the most current professional standards, nationally established criteria and/or best practices to reduce academic stress and the risk of suicide;

e.  failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the warning signs of suicide in students in-crisis;

f.  failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Adams were aware of and understood fully the warning signs of suicide in students; failing to hire, retain and ensure that the persons overseeing, supervising and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising and administering the services provided to Brian Joseph Adams were aware of and understood fully the warning signs of suicide in students crisis;

g. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the steps necessary to fully assess and treat students in-crisis;

h. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students in-crisis;

i. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students in-crisis;

j. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the steps necessary to assess and treat students with suicidal ideation;

k. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and

treat students with suicidal ideation;

l. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students with suicidal ideation;

m. failing to hire, retain and ensure that the persons providing services through UCC, including those providing such services to Brian Joseph Adams were aware of and complied with UCC confidentiality policies, including its policy waiving confidentiality when a student was in imminent danger of causing serious harm, including suicide, to himself failing to hire, retain and ensure that the persons overseeing, supervising and administering the UCC program, including those overseeing, supervising and administering the UCC program were aware of UCC confidentiality policies, including its policy waiving confidentiality when a student was in imminent danger of causing serious harm, including suicide, to himself;

n. failing to hire, retain and ensure that the persons providing the services offered by the University in its outreach and support programs regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of all of the programs and resources available to students in-crisis;

o. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University in its outreach and support programs regarding student psychological wellbeing, including those overseeing, supervising, and administering such were aware of all of the programs and resources available to students in-crisis.

WHEREFORE, the Plaintiff's demand judgment against the Defendant, jointly and severally with all other agents, servants, and employees in an amount that the finder of fact deems fair and just, plus punitive damages, and cost interests.

**COUNT II**

**WANTON AND WILLFUL MISCONDUCT AND RECKLESS DISREGARD**

93. The averments of the preceding paragraphs are incorporated herein by reference as though fully set forth at length.

94. As evidenced by Brian Joseph Adams availing himself of UCC Student Health, he was obviously aware of the "multiple programs and resources" designed to assist him in regaining his physical and mental health.

95. Despite availing himself of these services and the failure of Vanderbilt to provide any help, support and safety net, Brian became increasing despondent over his academic and social situation resulting in worsening anxiety, and suicidal thoughts.

96. Between November 12, 2020 and July 4, 2021, **Brian attempted suicide in his dorm room on two (2) separate occasion.** In addition, to two actually attempts at suicide in his

dorm room on no less than five occasions Brian either told Vanderbilt's employees, servants and agents or it was otherwise communicated to Vanderbilt that he was suicidal. Among these communications are:

      a.  the November 11 telephone call between Brian and UCC;

      b.  the UCC Intake form completed by Brian on November 11;

      c.  the November 12th Zoom meeting consultation with UCC;

      d.  the November 14th consultation with Vanderbilt University Police Department;

      e.  the November – December hospitalization thru his death on July 4, 2021.

      f.  Between November 12, 2020 and July 4, 2021, **Brian attempted suicide in his dorm room on two (2) separate occasion.**

97. Short of wearing a neon sign that he planned to commit suicide, Brian was all but begging Vanderbilt for help. Appallingly, Vanderbilt did not just fail him, it intentionally killed him.

98. None the less Vanderbilt's UCC decided to wait until after the July 4, 2021 holiday weekend before coordinating Brian's care with a member of the Office of the Student Care Coordinator.

99. Beginning as early as November 11, 2020, and continuing through the early morning hours of July 3, 2021, each and every Vanderbilt physician, mental health professional and Student Affairs Representative from whom Brian sought help had a duty to ensure his safety and wellbeing and protect him from harm;

100.    Beginning on November 12th and continuing until his death, the Vanderbilt professionals from whom he sought help knew or should have known that because of his

fixation with suicide, Brian was incapable of maintaining proper perspective or making sound decisions regarding his own health, safety, and wellbeing.

101.    Failure of these multiple professionals, all of whom were employed by or affiliated with Vanderbilt, Board of Trust and Chancellor Diermeier and working on its behalf, to take adequate and proper precautions or preventative measures to adequately treat Brian and protect him from harm during a period when they knew he articulated suicidal thoughts and plans or in the exercise of due care should have known that he was suicidal and that he was incapable of maintaining proper perspective and making sound decisions regarding his health, safety and wellbeing.

102.    General, gross, and corporate negligence of Vanderbilt as it pertains to Brian, consists of one or more of the following acts or omissions:

    a. failing to provide outreach and support programs regarding student psychological wellbeing that complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

    b. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

    c. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing,

including those providing such services to Brian Joseph Adams were aware of and complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

d. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Adams were aware of the most current professional standards, nationally established criteria and/or best practices to reduce academic stress and the risk of suicide;

e. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the warning signs of suicide in students in-crisis;

f. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Adams were aware of and understood fully the warning signs of suicide in students; failing to hire, retain and ensure that the persons overseeing, supervising and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising and administering the services

provided to Brian Adams were aware of and understood fully the warning signs of suicide in students crisis;

g.  failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the steps necessary to fully assess and treat students in-crisis;

h.  failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Adams were aware of, understood and took the necessary steps to fully assess and treat students in-crisis;

i.  failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Adams were aware of, understood and took the necessary steps to fully assess and treat students in-crisis;

j.  failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the steps necessary to assess and treat students with suicidal ideation;

k.  failing to hire, retain and ensure that the persons providing the

services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Adams were aware of, understood and took the necessary steps to fully assess and treat students with suicidal ideation;

l. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Adams were aware of, understood and took the necessary steps to fully assess and treat students with suicidal ideation;

m. failing to hire, retain and ensure that the persons providing services through UCC, including those providing such services to Brian Joseph Adams were aware of and complied with UCC confidentiality policies, including its policy waiving confidentiality when a student was in imminent danger of causing serious harm, including suicide, to himself failing to hire, retain and ensure that the persons overseeing, supervising and administering the UCC program, including those overseeing, supervising and administering the UCC program were aware of UCC confidentiality policies, including its policy waiving confidentiality when a student was in imminent danger of causing serious harm, including suicide, to himself;

n. failing to hire, retain and ensure that the persons providing the services

offered by the University in its outreach and support programs regarding student psychological wellbeing, including those providing such services to Brian Adams were aware of all of the programs and resources available to students in-crisis;

o. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University in its outreach and support programs regarding student psychological wellbeing, including those overseeing, supervising, and administering such were aware of all of the programs and resources available to students in-crisis;

103.   The wanton and willful misconduct of Vanderbilt University, Board of Trust and Chancellor Diermeier and Does 1-200 the safety and wellbeing during the Fall Semester of 2020 and Summer semester of 2021 until Brian's death on July 4, 2021 further consists of one or more of the following acts or omissions:

a. failing to take appropriate action in compliance with the most current professional standards, nationally established criteria and/or best practices to assist Brian during a time of intense crisis to restore his proper perspective and make sound decisions regarding his physical and mental health and wellbeing;

b. failing to take timely and appropriate action in compliance with the most current professional standards, nationally established criteria and/or best practices to either reduce Brian's risk of suicide or prevent him from

committing suicide, including but not limited to prescribing medication; providing appropriate psychotherapy; referring him to other clinicians who were more competent to treat his suicidal ideation; collaborating with other clinicians who were more competent to treat his suicidal ideation; consulting with other University programs, services and clinicians involved in assessing and treating students in- crisis; referring him to other facilities that were more capable to treat his suicidal ideation;

c. failing to notify Brian's parents that he was expressing suicidal ideation and/or was at imminent risk of self-harm;

WHEREFORE, the Plaintiff's demand judgment against the Defendants, jointly and severally with all other agents, servants, and employees in an amount that the finder of fact deems fair and just, plus punitive damages, and cost interests.

## COUNT III

## <u>NEGLIGENCE-WRONGFUL DEATH</u>

104.    The averments of the preceding paragraphs are incorporated herein by reference as though fully set forth at length.

105.    The wanton and willful misconduct of Vanderbilt University the safety and wellbeing during the Fall Semester of 2020 and Summer semester of 2021 further consists of one or more of the following acts or omissions:

a. failing to provide outreach and support programs regarding student

psychological wellbeing that complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

b. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

c. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of and complied with the most current professional standards, nationally established criteria and/or best practices to reduce the risk of suicide;

d. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Joseph Adams were aware of the most current professional standards, nationally established criteria and/or best practices to reduce academic stress and the risk of suicide;

e. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed

fully the warning signs of suicide in students in-crisis;

f. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of and understood fully the warning signs of suicide in students; failing to hire, retain and ensure that the persons overseeing, supervising and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising and administering the services provided to Brian Joseph Adams were aware of and understood fully the warning signs of suicide in students crisis;

g. failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the steps necessary to fully assess and treat students in-crisis;

h. failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students in-crisis;

i. failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing,

supervising, and administering the services provided to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students in-crisis;

j.  failing to formulate, implement and enforce policies, practices and guidelines regarding student psychological wellbeing that addressed fully the steps necessary to assess and treat students with suicidal ideation;

k.  failing to hire, retain and ensure that the persons providing the services offered by the University regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students with suicidal ideation;

l.  failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University regarding student psychological wellbeing, including those overseeing, supervising, and administering the services provided to Brian Joseph Adams were aware of, understood and took the necessary steps to fully assess and treat students with suicidal ideation;

m. failing to hire, retain and ensure that the persons providing services through UCC, including those providing such services to Brian Joseph Adams were aware of and complied with UCC confidentiality policies, including its policy waiving confidentiality when a student was in

imminent danger of causing serious harm, including suicide, to himself failing to hire, retain and ensure that the persons overseeing, supervising and administering the UCC program, including those overseeing, supervising and administering the UCC program were aware of UCC confidentiality policies, including its policy waiving confidentiality when a student was in imminent danger of causing serious harm, including suicide, to himself;

n.  failing to hire, retain and ensure that the persons providing the services offered by the University in its outreach and support programs regarding student psychological wellbeing, including those providing such services to Brian Joseph Adams were aware of all of the programs and resources available to students in-crisis;

o.  failing to hire, retain and ensure that the persons overseeing, supervising, and administering the services offered by the University in its outreach and support programs regarding student psychological wellbeing, including those overseeing, supervising, and administering such were aware of all of the programs and resources available to students in-crisis;

106.    Plaintiffs bring this action as the parents and wrongful death beneficiaries of Brian Joseph Adams, pursuant to the Tennessee Wrongful Death Act, Title 20 TN.C.S.A. §.20-5-107. The persons entitled by law to recover damages under the Tennessee Wrongful Death Act for the death of Brian Adams are his parents Bart and Josephine Adams.

WHEREFORE, the Plaintiff's demand judgment against the Defendant, jointly and severally with all other agents, servants, and employees in an amount that the finder of fact deems fair and just, plus punitive damages, and cost interests.

## COUNT IV

### PUNITIVE DAMAGES

107.     The averments of the preceding paragraphs are incorporated herein by reference as though fully set forth at length.

108.     The acts and failure to act by Defendant Vanderbilt University constituted despicable conduct intentionally committed in willful, wanton, reckless, conscious, deliberate, aggravated, outrageous, malicious, oppressive, with reprehensible disregard, to take advantage of, and with complete indifference, for the interests, rights, plight, misfortune, disability, weakness, safety of undergraduate Vanderbilt University student, Brian Adams, deceased.

109.     As a direct and proximate result of the conduct described above and the intentional failure of Vanderbilt University to take any steps to prevent the death of Brian Adams, Vanderbilt University intentionally ignored Brian's plight and was indifferent to the risks posed by Brian's suicide attempts, the plaintiff decedent was caused severe conscious physical and mental pain and suffering and death, Plaintiff is entitled to recover from Defendant Vanderbilt University punitive and exemplary damages.

110.    WHEREFORE, the Plaintiff's demand judgment against the Defendant, jointly and

severally with all other agents, servants, and employees in an amount that the finder of fact

deems fair and just, plus punitive damages, and cost interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.  For compensatory and general damages against Defendants, and each of them, in an
    amount according to proof but in excess of the minimum jurisdictional requirements of the
    Court.

2.  For special damages against the defendant, in an amount according to proof.

3.  For exemplary and punitive damages against the Defendant,

4.  For interest on all damages as allowed by law against Defendant.

5.  Medical expenses in excess of $95,884.44

6.  Reasonable funeral and burial expenses.

7.  For costs of suit herein incurred against Defendants.

## JURY DEMAND

The Plaintiff demands a trial by jury of all issues presented in this action.

Respectfully Submitted,

The Plaintiffs, DR. BART ADAMS, JR., and JOSEPHINE ADAMS as parents of BRIAN ADAMS, deceased; and DR. BART ADAMS, JR., and JOSEPHINE ADAMS individually; and Dr. BART ADAMS, JR., as the Personal Representative of the Estate of Brian Adams, Pro Se

Dr. Bart Adams, Jr.

Josephine Adams

11850 Freedom Drive Apt 1106
Reston, VA 20190
(571)-464-3109
bja@use.startmail.com

DATED: January 2, 2023