**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| DR. BART ADAMS, JR, and JOSEPHINE ADAMS, individually as parents and next of kin of BRIAN ADAMS, deceased; and DR. BART ADAMS, JR. as the Personal Representative of the Estate of Brian Adams,<br><br><br>Plaintiffs,<br><br>vs.<br><br>VANDERBILT UNIVERSITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 3:23-cv-00001<br><br>District Judge: Eli Richardson<br><br>Magistrate Judge: Barbara D. Holmes<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiffs, Dr. Bart Adams, Jr. and Mrs. Josephine Adams, file this First Amended Complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, against Vanderbilt University based upon the death of their son, Brian Adams, while residing on campus at Vanderbilt University.

This First Amended Complaint relates back, supersedes, and replaces the original Complaint filed in this matter. In support of their claims, Plaintiffs allege as follows:

**INTRODUCTION**

1. This action arises from the death of Vanderbilt University undergraduate student Brian Adams ("Brian" or "Mr. Adams").

2. On July 4, 2021, Mr. Adams hung himself in his dorm room while enrolled as a student living on-campus at Vanderbilt.

3. Vanderbilt employees found Mr. Adams deceased in his dorm room approximately 20 hours after his death.

4. Mr. Adams had attempted suicide in his dorm room on at least three prior occasions.

5. Vanderbilt was aware of previous attempts by Mr. Adams to take his own life while residing on campus prior to his last successful attempt.

6. Dr. Bart Adams and Mrs. Josephine Adams, Brian's next of kin, now bring this action to seek relief against Vanderbilt University based upon its failure to accommodate Mr. Adams' disability, its discrimination against Mr. Adams based upon his disability, its breach of contractual obligations owed to Mr. Adams, and his parents, as a student in good standing at Vanderbilt, and Vanderbilt's failure to exercise reasonable care and to adequately protect and guard against the dangerous condition it created by leaving a student that was a known threat to himself isolated in a dorm room alone. These acts led to the wrongful and premature death of Mr. Adams.

7. Plaintiffs do NOT allege medical negligence, nor do they make any allegations or claims that a health care provider caused the injuries complained of herein, or that such injuries were related to the inadequate provision of healthcare services.

8. Plaintiffs do NOT seek relief related to the provision of medical care under the Tennessee Healthcare Liability Act.

9. All allegations other than those personally known by Plaintiffs are made upon information and belief, whether stated or not.

## PARTIES

10. Plaintiffs, Dr. Bart Adams, Jr. ("Dr. Adams") and Mrs. Josephine Adams ("Mrs. Adams") are the parents and next of kin of the deceased, Brian Adams.

11. Dr. Adams and Mrs. Adams remain husband and wife and remain residents of the Commonwealth of Virginia.

12. Dr. Adams remains the administrator of Brian Adam's estate.

13. Defendant, Vanderbilt University ("Vanderbilt"), is a not-for-profit entity incorporated and organized under the laws of the State of Tennessee. Vanderbilt's principal place of business is located at 2100 West End Ave, Suite 750, Nashville Tennessee, 37203-5233. It can be served through its registered agent, General Counsel, 305 Kirkland Hall, Nashville, Tennessee 37240-001. It is the proper defendant to this action.

14. Vanderbilt, its programs, and activities receive federal financial assistance subjecting it to Section 504 of the Rehabilitation Act. Vanderbilt also constitutes a "public accommodation" under 42 U.S.C. § 12181 and is subject to Title III of the Americans with Disabilities Act.

**JURISDICTION & VENUE**

15. This Court has jurisdiction over the subject matter and claims presented in this Amended Complaint under 28 U.S.C. §§ 1331 and under 28 U.S.C. § 1332, as the amount in controversy is more than $75,000 and there is diversity of citizenship among the Parties.

16. Jurisdiction is also conferred upon this Court pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1367, as Plaintiff asserts violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and additional state law claims arising from the same facts as federal claims.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**FACTS**

18. Mr. Adams was born in Dallas, Texas in 1999. From an early age, Mr. Adams was an exceptional student and athlete.

19. Mr. Adams was admitted to multiple prestigious universities. But, Mr. Adams chose to attend Vanderbilt University as an incoming Freshman in the Fall of 2018.

20. Mr. Adams majored in English and History and was a student in good standing the Summer he died while attending Vanderbilt.

21. Unbeknownst to Mr. Adam's parents, who were listed as "emergency contacts" for their son, Mr. Adams began struggling with mental illness while attending Vanderbilt.

22. Mr. Adams attempted suicide at least three times while residing on campus as an enrolled student at Vanderbilt.

23. Vanderbilt was aware of Mr. Adams' prior suicide attempts. But it did not notify Mr. Adams' parents, his emergency contacts, of these incidents nor take sufficient measures to guard against Mr. Adams' subsequent fatal suicide attempts.

24. Mr. Adams succeeded with his final on-campus suicide attempt on July 4, 2021, resulting in his death at age 22.

25. Brian remained a student in good standing while attending Vanderbilt and was on track to graduate within four years as a member of the Class of 2022.

26. Brian was an active member of the multiple student organizations and associations, including Circle K International, The Vanderbilt Review, The Vanderbilt Historical Review, and The Vanderbilt Fencing Club. Brian also worked on campus for the Vanderbilt Central Library.

27. Brian was an active participant in various performing arts groups, including Vanderbilt Off-Broadway, Vanderbilt University Theatre, and the Iceberg Theater Company.

28. In the Spring of 2020, during the height of the COVID pandemic, Brian studied from home, as Vanderbilt's campus was essentially closed for students due to the pandemic.

29. Brian thrived at home; his grades were mostly A grades, and he was able to excel from home during the pandemic.

30. During the Fall of 2020, Brian lived off campus with his girlfriend. This was an unusual arrangement since Vanderbilt requires their students to live on campus. But, due to ongoing construction and its desire to isolate incoming Freshmen in dorm rooms to prevent the spread of COVID, certain upper-level students were allowed to live off campus.

31. On or around November 9, 2020, Brian suffered a break-up with his girlfriend while they were cohabitating off campus, which required Brian to move out of their shared apartment.

32. On or around November 10, 2020, Brian reached out to the Vanderbilt University Counseling Center ("UCC") to address his mental health and suicidal thoughts after his beak up.

33. Vanderbilt failed to address Brian's suicidal concerns on November 10th or November 11th, 2020, and sent Brian back to his dorm room alone until meeting with him two days later, on November 12, 2020.

34. Brian reported his suicidal ideations to an unlicensed therapist at Vanderbilt's UCC on or around November 12, 2020. The unlicensed therapist again allowed Brian to return alone to his dorm room to await a follow-up "Zoom" call the next day.

35. The unlicensed therapist took *no* steps to make sure Brian was not alone or to otherwise prevent foreseeable suicide attempts by Brian, such as transferring Brian to a nearby Emergency Room across the street to be observed by licensed professionals or by notifying Brian's emergency contacts, his parents.

36. Vanderbilt's only "accommodation" was to allow Brian to remain alone in the E. Bronson Ingram College dormitory and to schedule another Zoom call with an unlicensed student counselor the next day, November 13, 2020.

37. Upon information and belief, Vanderbilt nor its UCC staff initiated any suicide protocols or followed any policies or procedures regarding student suicide after Brian initially contacted the UCC about his suicidal thoughts on November 10, 2020, and further reported his suicidal intentions on November 12, 2020.

38. Upon information and belief, Vanderbilt and the UCC failed to contact Vanderbilt's Student Care Coordinator, or other appropriate housing staff, to coordinate Brian's care before allowing Brian to return to an on-campus dorm room, by himself, after reporting suicidal thoughts and tendencies.

39. A Faculty Head of College "Faculty Head" leads E. Bronson Ingram College. The Faculty Head works closely with Residential College staff, Student Care Coordinators, a graduate student worker, and the College Programming and Advisory Council to encourage living and learning outside of the classroom.

40. Students residing on campus are also allegedly supported by an area Coordinator, a Head Resident, and Resident Advisors who all live on campus at the college to assist and accommodate students residing in all university housing on campus as part of Vanderbilt's "Housing and Residential Experience."

41. As a "residential university," Vanderbilt requires students to reside on campus and proclaims to have adequate resources to assist, accommodate, and support students living on campus.

42. Upon information and belief, no faculty head, in-residence staff, head residents, student care coordinators, or resident advisors were notified by Vanderbilt or UCC staff that Mr. Adams reported suicidal ideations and presented a threat to himself before having him return to alone to his dorm at the E. Bronson College after visiting the UCC on November 12, 2020.

43. Upon the unlicensed therapist learning of Brian's suicidal ideations, she failed to provide adequate care for, and discriminated against, Brian by being completely indifferent to his mental impairment or disability, by failing to initiate appropriate suicide protocols, and by failing to have Brian admitted for clinical evaluations.

44. On November 13, 2020, a day after first reaching out to Vanderbilt's UCC, Brian again spoke to an unlicensed therapist via Zoom and reported new suicidal thoughts that started after Brian's in-person visit with the therapist at the UCC on November 12, 2020.

45. Upon information and belief during, Brian attempted suicide twice on November 13, 2020, by hanging himself in his dorm room at E. Bronson Ingram College.

46. Upon information and belief, the Vanderbilt Police were telephoned the following day on November 14, 2020.

47. Vanderbilt police arrived on November 14, 2020, to find that Brian was alive. But, Brian had "belt burn marks" around his neck from his failed suicide attempts.

48. Upon information and belief, the Vanderbilt University Police Department, removed Brian from the dorm on November 14, 2020, and took him to Vanderbilt

University Medical Center, Psychiatric Hospital.

49. Upon information and belief, the Vanderbilt Police Department incident report from the November 14 suicide attempt remains "missing."

50. Brian's parents, who were also his "emergency contacts," were not notified of this incident by Vanderbilt, UCC staff, or Vanderbilt Police.

51. Vanderbilt failed to exercise reasonable care to prevent foreseeable harm to Brian by failing to initiate appropriate suicide prevention protocols, failing to facilitate or encourage appropriate clinical care by licensed medical professionals, and failing to notify Brian's emergency contacts, his parents, if he refused such care.

52. Vanderbilt, its employees, and its agents, intentionally discriminated against Brian based upon his mental impairment, were deliberately indifferent to his impairment, and failed to accommodate Brian's impairment by ignoring his impairment and failing to deny him equal and appropriate access to available programs, policies, procedures, and activities provided to students to assist with and accommodate their mental health needs.

53. After his initial suicide attempts on November 13, 2020, Mr. Adams participated in an inpatient and outpatient care through the Vanderbilt University Medical Center Psychiatric Hospital.

54. Upon information and belief, instead of putting Mr. Adams on medical leave and marking his ongoing courses as "incomplete," Vanderbilt failed Mr. Adams in the courses he could not complete while participating in the inpatient and outpatient

care program.

55. Despite the desire of Mr. Adams to complete his coursework while receiving inpatient and outpatient care, Vanderbilt refused to let him continue his coursework and gave him "F" grades in the courses Vanderbilt prohibited him from completing during that time.

56. Mr. Adams was released from the Vanderbilt University Medical Center Psychiatric Hospital in December 2020 and continued to report to the Vanderbilt UCC and its staff.

57. Vanderbilt again placed Brian alone in a dormitory in the E. Bronson College for the Spring 2021 semester, despite Brian continuing to report new and heightened suicidal ideations and thoughts, reporting a desire to purchase a firearm, and after Brian's hospitalization for a prior suicide attempt in the E. Bronson College in November 2020.

58. Upon information and belief, Brian continued to significantly struggle with his mental health disability and remained suicidal, and a significant threat to himself, and potentially others, during the Spring 2021 semester.

59. Despite having actual knowledge of Brian's previous suicide attempts and knowledge of Brian's new and continuing suicidal thoughts and ideations, Vanderbilt again placed Mr. Adams alone in a dorm room at the E. Bronson College under the same or similar circumstances upon which he previously attempted to take his own life in November 2020.

60. Upon information and belief, no faculty head, staff, head residents, student care coordinators, or resident advisors at E. Bronson College were notified by Vanderbilt or UCC staff that Mr. Adam's reported suicidal ideations and presented a threat to himself prior to having him return to E. Bronson College and being left alone in his dorm for the Spring 2021 semester.

61. Upon information and belief, Brian again attempted suicide by cutting his wrists while residing in the E. Bronson College dormitories.

62. Vanderbilt nor the Vanderbilt UCC staff took any precautionary measures to prevent harm to Mr. Adams or to readmit Mr. Adams for clinical care upon learning of his new suicidal thoughts and ideations, or upon learning of his desire to purchase a firearm on or around February 2021. Nor did Vanderbilt or the UCC initiate proper suicide protocols or procedures or contract Mr. Adams' parents, his emergency contacts, to address Brian's continuing suicidal tendencies and continued risk of harm.

63. Upon information and belief, Vanderbilt medicated Mr. Adams and left him alone in his dorm room, despite knowing his history of suicide attempts and learning of new heightened suicidal thoughts and ideations.

64. Instead of advising Mr. Adams to take medical leave or advance his studies remotely from home, under supervision of his emergency contacts - his parents, Vanderbilt allowed Brian to enroll in summer courses and remain on campus the Summer of 2021, despite Mr. Adams previously attempting suicide, recently reporting additional suicidal ideations, and recently reporting to Vanderbilt staff

that he planned to purchase a firearm.

65. Vanderbilt moved Mr. Adams to the Lewis House dormitories for the summer semester, as E. Bronson College dormitories closed for the summer.

66. Vanderbilt created a known dangerous condition by again leaving Mr. Adams alone in a dorm room during the summer semester while increasing his workload when Vanderbilt was aware Mr. Adams previously attempted suicide, continued to report suicidal thoughts and ideations, and failed to take any remedial measures to prevent Mr. Adams from harming himself or others on Vanderbilt's campus.

67. Vanderbilt further perpetuated this dangerous condition by discriminating against Mr. Adams and failing to accommodate Mr. Adams by failing the courses he was enrolled in when he received inpatient care for his mental impairment and disability. And, by failing Mr. Adams' courses, instead of providing medical leave or incompletes, Vanderbilt created additional stress and anxiety upon Mr. Adams, exacerbating his disability and increasing the foreseeability of the dangerous condition - Mr. Adams again attempting suicide.

68. Vanderbilt failed to exercise reasonable care for Mr. Adams and discriminated against Mr. Adams by failing to initiate, implement, or follow standard suicide protocols or procedures, failing to advise appropriate residential housing staff of Mr. Adam's impairment, and failing to exercise precautionary or preventative reasonable alternative measures to prevent a readily foreseeable threat of harm to Mr. Adams, as Vanderbilt knew Mr. Adams previously attempted suicide and

suffered from a mental impairment, Mr. Adams continued to report being a threat to himself to Vanderbilt and its staff, and Mr. Adams reported intentions to purchase a firearm. Yet, Vanderbilt allowed Mr. Adams to increase his workload and remain alone in his dorm on campus.

69. Despite knowing Mr. Adams' history of suicide attempts, treatment for suicide, and recently heightened suicidal ideations, Vanderbilt allowed Mr. Adams to remain alone on campus over the July 4th holiday weekend.

70. On July 4, 2021, Brian Joseph Adams' body was found after hanging for approximately 20 hours in his dormitory room at Vanderbilt. His death was ruled by the medical examiner as a suicide by hanging. Brian's death occurred while he was enrolled as an undergraduate student at Vanderbilt residing on campus.

71. Upon information and belief, Mr. Adams was discovered on July 4, 2021, due to a wellness check requested by a friend, not due to Vanderbilt following suicide protocols or procedures necessitating Vanderbilt housing staff to check on students with a known history of suicide attempts and ongoing suicidal ideations.

72. Ms. Heng Sun was Mr. Adams' Resident Advisor ("RA") on July 4, 2021, when Mr. Adams committed suicide.

73. Mr. Adams' RA, Ms. Sun, was unaware of Mr. Adams' suicidal tendencies or any other mental impairments, she was not informed or advised to check on Mr. Adams, or to take any other precautionary measures to accommodate or protect Mr. Adams from foreseeable harm.

74. After obtaining actual knowledge of Mr. Adams' multiple suicide attempts and Mr. Adams reporting ongoing suicidal thoughts and ideations to the Vanderbilt UCC, Vanderbilt failed to initiate appropriate suicide prevention protocols, failed to facilitate appropriate clinical care by licensed medical professionals, and failed to notify Brian's emergency contacts.

75. Vanderbilt discriminated against Mr. Adams by failing to properly implement its own protocol for suicide which would have helped prevent the subsequent suicide attempt(s), which ultimately proved fatal.

76. At all times relevant to the Complaint, Vanderbilt purportedly formulated and enacted multiple programs and resources focused on helping its students manage on-campus housing, academic stress, and situational crises. In fact, as part of the fees for Vanderbilt, it charges all students for these services.

77. Among these programs and resources were the Vanderbilt University Counseling Center ("UCC"). According to Vanderbilt, the UCC provides a flexible and culturally responsive model of service that focuses on mental health and wellbeing. The services offered are specific and tailored plans for student, and referrals are developed for each student.

78. According to Vanderbilt, the UCC is set up so that students in crisis can receive responsive care which includes urgent care counseling, trauma informed care, psychological assessment, alcohol and other drugs assessment and consultation, eating disorder assessment and consultation, group therapy, and assistance with sports performance and mental health.

79. Prior to or upon Mr. Adams' arrival at Vanderbilt in the fall of 2018, Vanderbilt notified him of the services offered by UCC, through the Vanderbilt Student Affairs Department.

80. At all times relevant to the allegations in the Complaint, Vanderbilt by and through its executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, including but not limited to those individuals identified above, oversaw the individuals' providing services by and through UCC.

81. Vanderbilt, by and through these or other executives, directors, program administrators, senior management and other administrators, employees, servants, agents, contractors, subcontractors and/or other staff, formulated and enacted policies and procedures governing the operations of the UCC.

82. Upon information and belief, Vanderbilt has a comprehensive housing and residential experience comprised of extensive residential experience staff that coordinate with faculty and staff across the university, including the UCC, to nurture and support students residing on campus.

83. Vanderbilt intentionally discriminated against Mr. Adams, was deliberately indifferent to his mental impairment, and failed to accommodate his impairment, by completely denying him the benefit and enjoyment of the full scope of programs, services and activities provided by Vanderbilt's UCC and Vanderbilt's housing and residential experience departments.

84. Vanderbilt intentionally and systemically discriminated against Brian and others because of his mental health disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), *et seq.*

85. Vanderbilt failed to provide Mr. Adams reasonable accommodations for his mental impairment, and it negligently and recklessly left a suicidal student alone without adequate accommodations, creating a dangerous condition for Mr. Adams, and other students, while residing on campus in Vanderbilt's dormitories.

86. Vanderbilt offers undergraduate and graduate academic programs that are highly competitive and consistently rated among the top in the country, but Vanderbilt failed to equally accommodate students, including Mr. Adams, that have mental health disabilities or impairments.

87. Vanderbilt has consistently failed to modify their policies and procedures regarding mental health disability and systemically failed to accommodate Mr. Adams, and other students, with mental impairments or disabilities. This systemic failure by Vanderbilt to accommodate students with disabilities violates federal laws enacted to protect disabled persons like Mr. Adams.

88. For instance, Vanderbilt's withdrawal policies and practices push students with mental health disabilities or impairments out of Vanderbilt, impose punitive consequences on students who withdraw, and place unreasonable burdens on students who, after a withdrawal, seek reinstatement. Withdrawal by Brian would have been detrimental to him, as readmittance would not be guaranteed.

89. Upon information and belief, Vanderbilt encouraged Mr. Adams to take an increased workload and to enroll in summer courses to discriminate against Mr. Adams based upon his impairment and to push him to withdraw, which ultimately contributed to the dangerous condition and circumstances that caused his premature death.

90. Upon information and belief, Vanderbilt discriminated against Mr. Adams by failing his coursework while he received inpatient medical care for his disability as part of its attempt to pressure Mr. Adams to withdraw from the university.

91. There is a routine pattern and regular occurrence of Vanderbilt students struggling with mental health issues while residing on campus.

92. Vanderbilt's failure to adequately address and accommodate student mental health impairments causes a regularly occurring dangerous condition in on-campus housing leading to an increased prevalence of attempted and successful student suicides in on-campus housing.

93. Vanderbilt's failure to accommodate Mr. Adams' disability and failure to exercise reasonable care to address Mr. Adams' disability after obtaining actual knowledge of Mr. Adams' suicidal ideations and attempts to take his own life while residing on campus, not only constitutes unlawful discrimination, but gross negligence by Vanderbilt.

94. Vanderbilt's failure to accommodate Mr. Adams' disability or take appropriate measures to guard against his known threatening behavior towards himself was the actual and proximate cause of the death of Mr. Adams.

95. Vanderbilt's pattern and practice of failing to adequately protect and exercise reasonable care for students with mental impairments and disabilities, such as

Mr. Adams', and failure to protect against known dangerous condition(s) created on campus from failing to exercise reasonable care for the students residing on university property, amounts to intentional systemic discrimination, and deliberate indifference, towards a disabled class of students suffering from, and susceptible to, such impairments due to the high academic standards and pressures associated with performing at an institution such as Vanderbilt.

**CAUSES OF ACTION**

**COUNT I**
**WRONGFUL DEATH**
**NEGLIGENCE – PREMISES LIABILITY**

96.  Plaintiffs adopt and incorporate Paragraphs 1 through 95 as if fully set forth herein.

97.  Vanderbilt owns and operates the dormitories on its campus, including the E. Bronson Ingram College dormitories and Lewis House dormitories where Mr. Adams attempted suicide and eventually took his own life.

98.  Vanderbilt, as the owner and operator of all on campus student housing, including the E. Bronson Ingram College dormitories and Lewis House dormitories, has a duty to protect students required to reside on campus, such as Mr. Adams, against dangerous conditions created by Vanderbilt, or dangerous conditions for which it has actual or constructive knowledge.

99.  Vanderbilt knew, or should have known, Mr. Adams had suicidal ideations and a history of previous suicide attempts.

100. Vanderbilt knew, or should have known, Mr. Adams was previously committed to a Vanderbilt psychiatric hospital for treatment due to his suicide ideations and previous suicide attempts.

101. Vanderbilt knew, or should have known, Mr. Adams continued to experience suicidal ideations and had suicidal tendencies prior to being placed alone in the E. Bronson Ingram dormitories and Lewis House dormitories.

102. Vanderbilt knew, or should have known, Mr. Adams planned to purchase a firearm to keep in his dorm on campus.

103. Vanderbilt knew, or should have known, an increased workload from attending summer school would create increased stress and pressure on Mr. Adams.

104. Vanderbilt knew, or should have known, failing Mr. Adams' coursework while he received inpatient and outpatient care for his disability would create additional stress, pressure, and anxiety, which would foreseeably contribute to the dangerous condition of Mr. Adams committing suicide.

105. Despite knowing Mr. Adams' history of suicidal ideations, suicide attempts, and suicidal tendencies, Vanderbilt placed Mr. Adams in a dorm room at the E. Bronson Ingram College and Lewis House alone, by himself, without taking any measures to guard against the foreseeable probability of the loss of life that would, and did, occur by placing a highly suicidal student alone in a dorm room without any supervision or taking any other appropriate measures to guard against the foreseeable probability of harm.

106. Vanderbilt created unsafe conditions at the E. Bronson Ingram College and Lewis House dormitories by creating a foreseeable unreasonable risk of harm to Mr. Adams by placing him alone in a dorm room without taking *any* measures to protect Mr. Adams when Vanderbilt knew, or should have known, Mr. Adams presented a significant dangerous threat of harm to himself, and potential threat of harm to other students housed at the E. Bronson Ingram College and Lewis House dormitories.

107. Upon information and belief, Vanderbilt failed to notify Mr. Adams' Resident Assistant, or any other individuals responsible for student housing at the E. Bronson Ingram College or Lewis House dormitories, about Mr. Adams' mental impairment, intentions to purchase a firearm, and the high risk of harm Mr. Adams presented to himself, and potentially other students, housed in the dormitories.

108. Vanderbilt breached its duty owed to Mr. Adams by failing to exercise reasonable care to prevent the foreseeable unsafe condition it created when it knowingly placed Mr. Adams, a student with a history of suicidal ideations and known previous suicide attempts, alone in a dorm room without taking *any* precautions to guard against the unsafe condition.

109. The risk of harm created by placing Mr. Adams in a dorm room alone was foreseeable, unreasonable, and preventable.

110. Upon information and belief, Vanderbilt failed to initiate or implement any reasonable alternative measures or policies to guard against the dangerous

condition it created by placing Mr. Adams in a dorm room alone at the E. Bronson College and Lewis House dormitories.

111.   Upon information and belief, Vanderbilt did not initiate or implement any suicide protocols, or follow any policies and procedures regarding student suicide, after relocating Mr. Adams into the Lewis House and E. Bronson Ingram College dormitories.

112.   Vanderbilt had actual knowledge that Mr. Adams was a threat to his own health and safety, and potential the health and safety of other students, while residing on campus, as Mr. Adams attempted to avail himself of Vanderbilt's UCC services, provided Vanderbilt, through UCC staff, actual and/or constructive knowledge of his suicidal ideations, continued heightened suicidal ideations, plans to purchase a firearm, and Vanderbilt itself committed Mr. Adams after he previously attempted to take his own life on multiple occasions while residing on campus.

113.   Despite knowing Mr. Adams suicidal history, Vanderbilt failed to take any reasonable measures or engage in any reasonable alternative course of action to protect Mr. Adams while he resided in the dormitories on Vanderbilt's property, as required by Vanderbilt housing policies.

114.   Upon information and belief, Mr. Adams also advised staff at the UCC of his desire to purchase a firearm to keep with him in his dorm on campus. But, Vanderbilt failed to notify campus police, or take any other appropriate action, in response to the potential danger Mr. Adams would present to himself or others

by obtaining and keeping a firearm on campus.

115. Short of wearing a neon sign that he planned to commit suicide, Brian all but begged Vanderbilt for help and attempted suicide twice, the first by hanging and the second by cutting his wrist. But Vanderbilt failed to take any reasonable measures or otherwise exercise any reasonable care to protect Mr. Adams, or other students residing on campus, from the unsafe condition it created by placing Mr. Adams alone in a dorm on campus without adequate supervision, which ultimately resulted in the loss of Mr. Adam's life.

116. Vanderbilt's failure to take reasonable measures to guard against the unsafe condition created by placing Mr. Adams alone in a dorm room was the actual and proximate cause of Mr. Adams' death, as it was highly foreseeable a student with known suicidal tendencies would commit suicide if placed on campus alone, especially after increasing Mr. Adams academic responsibilities. And, but for Vanderbilt failing to exercise any reasonable precautions to prevent the known unsafe condition it created by placing Mr. Adams alone in a dorm, Mr. Adams would not have committed suicide in Vanderbilt's dormitories.

117. Vanderbilt, its staff, and its instrumentalities, failed to take adequate and proper precautions or preventative measures considering the known dangerous condition Mr. Adams presented while residing in housing owned and operated by Vanderbilt.

118. Upon information and belief, Vanderbilt also has knowledge of similar suicide incidents occurring in on-campus housing and has constructive notice of this

regularly occurring dangerous condition in its on-campus housing.

119. Despite having knowledge of a recent pattern of conduct of students regularly attempting or committing suicide on campus, Vanderbilt failed to take any measures to remedy this routine or commonly occurring dangerous condition.

120. Vanderbilt, as the owner and operator of E. Bronson Ingram College and other on-campus dormitories, has a duty to warn and guard against this pattern of conduct and recurring suicide incidents occurring on its campus, including a duty to warn and protect Mr. Adams of such dangerous conditions for which it had constructive and actual knowledge.

121. As a "residential university" requiring its students to reside in on-campus housing paid for by students attending Vanderbilt, Vanderbilt has a special relationship with its students that obligate it to provide a heightened duty of care to protect the students it mandates reside in its residential housing facilities.

122. Vanderbilt's failure to implement, adopt, or initiate appropriate suicide protocols, contract Mr. Adam's emergency contracts, or take other appropriate measures to guard against the foreseeable unsafe conditions created by Vanderbilt by placing Mr. Adam's alone in a dorm breached the standard duty of care, and any potential heightened duty of care, Vanderbilt owed Mr. Adams as a resident of its student dorms.

123. Vanderbilt's failure to notify any coordinator, head resident, Mr. Adam's resident advisor, or any other appropriate individuals within Vanderbilt residential housing or the E. Bronson Ingram College and Lewis House

dormitories, further perpetuated the dangerous condition Vanderbilt created by placing Mr. Adams alone in a dorm room with suicidal tendencies.

124. Vanderbilt's failure to exercise reasonable care under the circumstances and failure to engage in alternative conduct that would have prevented the foreseeable risk of harm to Mr. Adams was the actual and proximate cause of the death of Mr. Adams.

125. But for Vanderbilt failing to take necessary and appropriate measures to prevent the foreseeable harm to Mr. Adams, Mr. Adams would not have made a third successful attempt to take his own life.

126. Mr. Adams parents and next of kin, have suffered immeasurable damages from the loss of consortium of their son and are also entitled, under Tennessee's wrongful death statutes, to also recover the damages suffered by Mr. Adams because of Vanderbilt's failure to exercise reasonable care to guard against known dangerous conditions and threats of harm on its campus.

**COUNT II**

**WRONGFUL DEATH**
**NEGLIGENCE**

127. Plaintiffs adopt and incorporate Paragraphs 1 through 126 of the Complaint as if fully set forth and restated herein.

128. Vanderbilt owed Mr. Adams, as an enrolled student residing on campus, a duty of ordinary and reasonable care.

129. As a "residential university" mandating its students to reside in on-campus

housing paid for by students attending the university, Vanderbilt arguably owed Mr. Adams a heightened duty of care due to the special relationship between Vanderbilt and Mr. Adams, as a fulltime student required to reside in on-campus housing.

130. Vanderbilt breached a standard duty of care owed to Mr. Adams by failing to exercise ordinary reasonable care when it placed Mr. Adams in the E. Bronson Ingram and Lewis House dormitories alone without implementing or initiating any policies or procedures to guard against the known imminent and foreseeable threat of harm Mr. Adams posed to himself.

131. Vanderbilt had actual knowledge that Mr. Adams continued to have suicidal ideations and tendencies and posed a significant threat of harm to himself, and potentially others, when it placed him in the E. Bronson Ingram College and Lewis House dormitories alone.

132. Vanderbilt knew of Mr. Adams' history of suicidal ideations and previous suicide attempts through his reporting of his suicidal thoughts and tendencies to staff at Vanderbilt's UCC, his hospitalization and clinical treatment for suicide, and his previous suicide attempts while housed on campus at Vanderbilt.

133. Vanderbilt's actual and constructive knowledge of Mr. Adams' suicidal tendencies, thoughts, and ideations, and previous suicide attempts, imposed a heightened duty of care and required Vanderbilt to take necessary measures to guard against the foreseeable harm presented to Mr. Adams while residing on campus as student under the care, custody, and control of the university.

134. Vanderbilt knew, or should have known, placing Mr. Adams in a dorm room alone without appropriate precautions would result in Mr. Adams' loss of life.

135. Vanderbilt's failure to initiate or implement appropriate suicide protocols, or other similar policies and procedures, when placing a student with known suicidal tendencies in a dorm room alone breached the duty of ordinary and reasonable care, and any potential heightened duty of care, owed to Mr. Adams.

136. Vanderbilt's failure to direct Mr. Adams to appropriate clinical care or contact his emergency contacts after he expressed continued suicidal tendencies to UCC staff, of which Vanderbilt knew or should have known, breached the duty of ordinary and reasonable care Vanderbilt owed to Mr. Adams.

137. Vanderbilt's placement of Mr. Adams in the E. Bronson Ingram and Lewis House dormitories with actual or constructive knowledge of Mr. Adams' continued suicidal ideations, reports of purchasing a gun, and his history of suicidal thoughts and clinical treatment for mental health issues/impairments related to previous suicide attempts while residing on campus breached the duty of care owed to Mr. Adams and was willful, wanton and/or reckless.

138. Vanderbilt's failure to exercise ordinary reasonable care under the circumstances was the actual and proximate cause of Mr. Adams' death, as it was foreseeable Mr. Adams would harm himself, considering his history of known suicide attempts and known clinical treatment for suicide.

139. Mr. Adams would still be alive but for Vanderbilt failing to take any precautions to guard against the known and foreseeable threat of harm Mr. Adams presented to himself.

140. Mr. Adams and his parents have suffered immeasurable damages due to Vanderbilt's breach of its duty to exercise ordinary reasonable care for Mr. Adams while residing on Vanderbilt's campus.

141. Mr. Adams and his parents, as next of kin, are entitled to any and all punitive damages resulting from Vanderbilt's reckless conduct concerning the breach of the duty of care owed to Mr. Adams.

## COUNT III
## VIOLATIONS OF ADA
## (42 U.S.C. §§ 12181, et seq.)

142. Plaintiffs adopt and incorporate Paragraphs 1 through 141 as if fully set forth herein and specifically allege Vanderbilt's acts and omissions discriminated against Mr. Adams based upon his actual and perceived disabilities.

143. Mr. Adams suffered from a recorded mental impairment and was regarded or perceived as having an impairment that qualifies as a "disability" under 42 U.S.C. § 12102.

144. Vanderbilt is a private not-for-profit entity that owns and operates a place of "public accommodation" that must adhere to the requirements of Title III of the ADA.

145. Title III prohibits a place of public accommodations from denying or

affording an unequal opportunity to an individual with disability, on the basis of his or her disability, or the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

146. Vanderbilt denied and failed to afford Mr. Adams the equal opportunity to participate and benefit from the services, facilities, programs, and accommodations afforded other students on the basis of his disability, as it denied Mr. Adams the equal enjoyment of its housing benefits and failed to provide Mr. Adams with appropriate services in light of his disability. And, Vanderbilt discriminated against Mr. Adams by being deliberately indifferent to his impairment and disability by failing his coursework while he received treatment for his disability and by leaving him alone in the E. Bronson College and Lewis House dormitories without appropriate accommodations.

147. Title III provides that goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual. 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

148. Title III provides that an individual or entity shall not utilize standards or criteria or methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disabilities cannot fully and equally enjoy any goods, services,

facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

149. Title III further defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

150. Vanderbilt took adverse actions against Mr. Adams and discriminated against Mr. Adams based upon his disability and mental impairment by failing his courses while he attempted to receive medical care for his disability, increasing his workload, and failing to appropriately address and accommodate Mr. Adams' disability, for which Vanderbilt has actual and constructive knowledge, and failing to provide Mr. Adams full and equal access to its services, facilities, or accommodations, which constitutes unlawful discrimination under 42 U.S.C. §§ 12182(a) and (b).

151. Vanderbilt's failure to implement and adhere to appropriate suicide protocols, or related policies and procedures, to accommodate and ensure the reasonable care of Mr. Adams in light of his mental impairment and disability constitutes an unlawful failure to accommodate under Title III of the ADA.

152. Vanderbilt's failure to properly adjust Mr. Adams' academic studies and failure to accommodate his housing in light of his known mental disability not only had the effect of discriminating against Mr. Adams and failed to reasonably accommodate his disability, but intentionally discriminated

against Mr. Adams and indicated extreme deliberate indifference to his mental disability that ultimately led to his loss of life.

153. Accommodating Mr. Adams' mental impairment by initiating proper suicide protocols, providing necessary and appropriate clinical attention, providing minimal support and supervision, or, at the least, notifying Mr. Adams' parents as his "emergency contracts," would not fundamentally alter the nature of Vanderbilt's public accommodation.

154. To the contrary, Vanderbilt should be obligated and required to make such necessary and proper reasonable accommodations for individuals with mental impairments, such as Mr. Adams, to protect against the threat of future injury.

155. Vanderbilt's practice and conduct of failing to properly accommodate and address Mr. Adams' mental impairment, as set forth above, constitutes unlawful discrimination under 42 U.S.C. §§ 12182(a) and (b), as it subjected Mr. Adams to disparate treatment based upon his disability and Vanderbilt denied Mr. Adams the full and equal enjoyment of Vanderbilt's goods, services, facilities, privileges, and accommodations.

156. Vanderbilt treated Mr. Adams differently due to his mental disability and its failure to treat Mr. Adams equally and afford him equal access and enjoyment to its academics, housing, programs, and activities constitutes unlawful discrimination under the ADA.

157. Vanderbilt's conduct and practices as set forth in above also constitute unlawful discrimination under the subparts of 42 U.S.C. §§ 12182 (b).

158. Vanderbilt's conduct and practices in violation of Title III of the ADA

damaged Mr. Adams, leading to his loss of life.

159. Plaintiffs seek a declaration that Vanderbilt acted in violation of the ADA and that Vanderbilt be enjoined from future conduct.

160. Plaintiff further seeks that Vanderbilt be ordered to adhere to appropriate policies, procedures, and guidelines to avoid such imminent threats of harm to students with mental impairments like those of Mr. Adams.


**COUNT VI**
**VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT**
**(29 U.S.C. §§ 794, et seq.)**

161. Plaintiffs adopt and incorporate Paragraphs 1 through 160 as if fully set forth herein and specifically allege Vanderbilt's acts and omissions, through its agents and instrumentalities, discriminated against Mr. Adams based upon his actual and/or perceived disabilities.

162. Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

163. Mr. Adams suffered from a mental impairment that qualifies as a disability.

164. Vanderbilt is a private not-for-profit university that receives federal funding for its programs and activities and is subject to the requirements of Section 504 of the Rehabilitation Act of 1973.

165. Vanderbilt excluded and denied Mr. Adams the full benefits of the programs, housing, and activities afforded all students based upon his disability.

166. Vanderbilt excluded Mr. Adams from participation in, and denied Mr. Adams the benefits of, appropriate housing, counseling, and other benefits and services offered by the university based upon his impairment and disability.

167. Vanderbilt subjected Mr. Adams to discrimination based upon his disability and mental impairment by failing to appropriately address and accommodate Mr. Adam's disability, for which Vanderbilt has actual and constructive knowledge, and by failing to provide Mr. Adams full and equal access to its services, facilities, or accommodations, which constitutes unlawful discrimination under Section 504 of the Rehabilitation Act of 1973.

168. Vanderbilt discriminated against Mr. Adams, and treated Mr. Adams differently based upon his disability, by excluding and denying Mr. Adams participation in and the benefits of the university's healthcare and mental health programs and activities specifically designed to accommodate and treat Mr. Adams' disability.

169. Vanderbilt failed to follow or implement appropriate policies to address and accommodate Mr. Adams' disability and Vanderbilt's failure to follow and adhere to its own policies to address Mr. Adams' disability resulted in the disparate treatment of Mr. Adams, deliberate indifference towards Mr. Adams, and illegal discrimination against Mr. Adams due to his disability.

170. Vanderbilt's exclusion of Mr. Adams from its programs and denial of the benefits of its federally funded programs and activities and support services provided through the UCC, residential housing, or otherwise, as set forth fully herein the Amended Complaint, by reason of Mr. Adams' mental

impairment, constitutes unlawful discrimination.

171. Vanderbilt's unlawful discrimination against Mr. Adams resulted in his loss of life and resulted in significant damages to Mr. Adams and Plaintiffs.


**COUNT V**
**BREACH OF CONTRACT**

172. Plaintiffs adopt and incorporate Paragraphs 1 through 171 as if fully set forth herein.

173. Vanderbilt and Mr. Adams had a valid and enforceable contract based upon Mr. Adams' payment of significant tuition fees for enrollment as a student and Vanderbilt's provision of instruction, housing, food and access to all amenities, activities, and programs available for students enrolled at the university.

174. Upon information and belief, Mr. Adams and Vanderbilt executed valid and enforceable agreements obligating Vanderbilt to provide Mr. Adams equal access to all its programs and activities.

175. Mr. Adams and Vanderbilt had valid and enforceable agreements regarding Mr. Adams residing on campus as a condition of his enrollment at Vanderbilt and Vanderbilt, upon information and belief, made material representations to Mr. Adams, and to Mr. Adams' parents, regarding the care and services it would provide to Mr. Adams while residing on campus in return for the consideration provided by Mr. Adams and his parents for Mr. Adams to attend and matriculate from Vanderbilt.

176. Upon information and belief, Vanderbilt mandated Mr. Adams reside on

campus as part of its contractual agreement with Mr. Adams and his parents for Mr. Adams to enroll as a fulltime student at Vanderbilt.

177. Vanderbilt materially breached its obligations and failed to perform in accordance with the agreements it made with Mr. Adams, and Mr. Adams' parents, by failing to afford Mr. Adams access to all of Vanderbilt's activities and programs and failing to provide Mr. Adams with suitable housing, and failing to accommodate Mr. Adams' disability, as they had notice of such disability.

178. Vanderbilt's failure to exercise ordinary care for Mr. Adams, failure to accommodate Mr. Adams, failure to provide Mr. Adams full enjoyment and access to Vanderbilt's residential housing programs and UCC programs, all amount to a material breach of the valid and enforceable agreements entered between Mr. Adams, Mr. Adams' parents, and Vanderbilt.

179. Vanderbilt's failure to perform in accordance with the agreements with Mr. Adams caused Mr. Adams to suffer damages as detailed throughout the instant Complaint.

180. Mr. Adams and his parents have suffered immeasurable damages due to Vanderbilt's breach of the material terms and conditions of Mr. Adams' enrollment at Vanderbilt.

181. Dr. Adams and Mrs. Josephine Adams, as the parents and next of kin of Mr. Adams, are entitled to recover the damages incurred by Mr. Adams due to Vanderbilt's breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment on all Counts and pray as follows:

1. That the Court declare Vanderbilt violated Mr. Adams' rights and unlawfully failed to accommodate his disability, and unlawfully discriminated against Mr. Adams based upon his disability, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181, *et seq.* and in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* and all subparts thereto;

2. That the Court *enjoin* Vanderbilt and its agents, employees and instrumentalities from continuing to discriminate against Mr. Adams or any similarly-situated students suffering from mental disabilities and that Vanderbilt be required to reasonably accommodate and address student mental health and mental impairments through adoption of appropriate protocols, policies and procedures, or other necessary measures as deemed appropriate by the Court to discontinue ongoing violations of all state and federal antidiscrimination laws such as those aforementioned;

3. An award of appropriate compensatory *and* punitive damages to Plaintiffs, as next of kin of Mr. Adams, and as representative of his estate, against Vanderbilt in an amount to be determined by a jury based upon the gross negligence and other acts and omissions of Vanderbilt leading to the premature and wrongful death of Mr. Adams;

4. Prejudgment and post judgment interest on all damages, as permitted by law;

5. Reasonable costs and attorneys' fees; and

6. All additional relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues presented in this action.

Respectfully submitted,

 _/s/ William B. Hawkins III
William B. Hawkins III (BPR #20117)
Lee Pope (BPR #28742)

**Hawkins Hogan, PLC**
205 17th Avenue North, Suite 202
Nashville, Tennessee 37203
(615) 726-0050
(615) 726-5177 (facsimile)
whawkins@hawkinshogan.com
lpope@hawkinshogan.com