IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DR. BART ADAMS, JR. and JOSEPHINE ADAMS, individually and as parents and next of kin of BRIAN ADAMS, | ) ) ) | NO. 3:23-cv-00001 |
| | ) | |
| Plaintiffs, | ) | JUDGE RICHARDSON |
| | ) | |
| v. | ) | |
| | ) | |
| THE VANDERBILT UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the Court is the motion (Doc. No. 24, "Motion") filed by The Vanderbilt University ("Defendant") to dismiss the claims against it set forth in the "First Amended Complaint" (Doc. No. 8, "FAC")[1] filed by Dr. Bart Adams, Jr., and Mrs. Josephine Adams (collectively, "Plaintiffs"), the parents of former Vanderbilt University[2] undergraduate student, Brian Adams ("Adams"). Defendant filed a memorandum in support (Doc. No. 25). Plaintiffs filed a response in opposition (Doc. No. 32, "Response"), to which Defendant filed a reply (Doc. No. 37).

---

[1] The initial Complaint (Doc. No. 1) was filed on January 3, 2023. On February 22, 2023, Plaintiffs filed two amended complaints, both of which Plaintiff titled "First Amended Complaint." (Doc. Nos. 7-8). It appears that these two documents are identical, although Doc. No. 8 had attached a summons (Doc. No. 8-1). The Court will cite Doc. No. 8 when citing the "First Amended Complaint" ("FAC"), which is the operative complaint in this case.

[2] Defendant herein is, essentially, the legal entity that operates the institution known as Vanderbilt University. That is, as alleged by Plaintiffs, Defendant (the party being sued in this case) is "a not-for-profit entity incorporated and organized under the laws of the State of Tennessee." (Doc. No. 8 at ¶ 13). A university as an institution of higher learning (with various attributes such as academic programs, campus(es), policies, sports teams, rankings, etc.) can be conceived of separately from the legal entity that operates it. But for ease of reference, with a few apt exceptions, the Court herein uses the term "Defendant" to refer to both the institution and the legal entity that operates it.

For the reasons discussed herein, the Court will grant the Motion.

## BACKGROUND[3]

This action arises from the death of Adams. Adams enrolled at Vanderbilt University as a freshman in the Fall of 2018. (Doc. No. 8 at ¶ 19). At some point during his enrollment, Adams began struggling with mental illness. (*Id*. at ¶ 21). During the Fall of 2020, Adams lived off-campus with his girlfriend.[4] (*Id*. at ¶ 30). On or around November 9, 2020, Adams suffered a break-up with his girlfriend, causing him to move out of their shared apartment.[5] (*Id*. at ¶ 31). On or around November 10, 2020, Adams solicited counseling services from Defendant's University Counseling Center ("UCC") where Adams expressed having suicidal thoughts after he and his girlfriend separated. (*Id*. at ¶ 32). Without addressing Adams's concerns, Defendant sent Adams back to his dorm alone until meeting with him again on November 12, 2020. (*Id*. at ¶ 33). At the November 12, 2020 meeting, Adams again reported his suicidal ideations, this time to an

---

[3] The facts herein are taken from the FAC (Doc. No. 8). For purposes of the instant Motion, the facts in the FAC are accepted as true, except to the extent that they are qualified herein (as for example by "Plaintiffs allege") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[4] Generally, Defendant requires its students to live on-campus. But due to ongoing construction and social distancing measures implemented to combat COVID-19, certain upper-level students were permitted to live off-campus during the Fall 2020 semester. (*Id*. at ¶ 30).

[5] The FAC does not state that Adams immediately relocated to on-campus housing upon moving out of the shared apartment with his former girlfriend. However, given the proximity of time in which the relevant events occurred, the Court infers that Adams moved directly from his shared apartment to on-campus housing. For example, the FAC states that "[o]n or around November 9, 2020, [Adams] suffered a breakup with his girlfriend . . . which required [him] to move out of their shared apartment." (*Id*. at ¶ 31). Two paragraphs later, the FAC states that "[Defendant] failed to address [Adams'] concerns on November 10th or November 11th, 2020, and sent [Adams] back to his dorm room alone until meeting with him two days later, on November 12, 2020." (*Id*. at ¶ 33). The Court concludes from this that Adams relocated from the apartment he shared with his former girlfriend to an on-campus dorm room sometime between November 9, 2020 and November 11, 2020.

unlicensed therapist at the UCC. (*Id*. at ¶ 34). After learning of Adams's suicidal ideations, UCC's unlicensed therapist did not take any steps to ensure that Adams was not alone or to prevent a suicide attempt by Adams. (*Id*. at ¶ 35). For example, the unlicensed therapist did not contact Defendant's student care coordinator to coordinate Adams's medical care before allowing Adams to return to a dorm room by himself or notify his emergency contacts (i.e., Plaintiffs) about his suicidal ideation.[6] (*Id*. at ¶ 38). Instead, the unlicensed therapist again sent Adams back to his dorm alone and scheduled a follow-up Zoom call with an unlicensed student counselor[7] for the next day (November 13, 2020). (*Id*. at ¶¶ 34, 36).

During Adams's follow-up Zoom call with an unlicensed therapist UCC on November 13, 2020, Adams reported new suicidal thoughts that started after his in-person visit the day before. (*Id*. at ¶ 44). Adams attempted suicide twice that day (November 13, 2020) by attempting to hang himself in his on-campus dorm room.[8] (*Id*. at ¶ 45). Defendant's campus police department was phoned the next day (November 14, 2020) and arrived to find "belt burn marks" around Adams's

---

[6] Defendant asserts that at all times relevant to the FAC, Adams was at least 18 years of age. (Doc. No. 25 at 4). Plaintiff does not dispute this assertion, and the assertion is consistent with Plaintiff's allegations regarding the date of his birth and the date of his matriculation at Vanderbilt. (Doc. No. 8 at ¶¶ 18-19).

[7] In the FAC, Plaintiffs frequently refer to an "unlicensed therapist" working for the UCC with whom Adams engaged at various times. However, in ¶ 36, Plaintiffs refer to an "unlicensed student counselor" with whom Adams was scheduled to meet during his November 13, 2020 follow-up Zoom call. Subsequent paragraphs make no reference to the "unlicensed student counselor," and instead use the term "unlicensed therapist." Plaintiffs' Response states, "Vanderbilt attempts to frame the [FAC] as involving a 'health care provider' because Plaintiffs' [sic] allege [Adams] saw an unlicensed student counselor at the Vanderbilt University Counseling Center ('UCC'). But the [FAC] clearly alleges this student counselor or 'therapist' was unlicensed . . . ." (Doc. No. 32 at 5). Thus, it appears from Plaintiffs' Response that Plaintiffs intended to use "unlicensed therapist" synonymously with "unlicensed student counselor." Consistent with the FAC and Plaintiffs' Response, the Court uses the term "therapist" herein to refer to an "unlicensed student counselor."

[8] It is unclear from the FAC whether Adams's attempted suicides on November 13, 2020 occurred before or after his follow-up meeting with a UCC therapist. However, given that police did not arrive until the following day (November 14, 2020), the Court surmises that Adams's suicide attempts likely occurred after his follow-up Zoom call.

neck. (*Id*. at ¶ 47).[9] Upon learning this information, representatives of Defendant removed Adams from his dorm room and took him to a psychiatric hospital. (*Id*. at ¶ 48). Adams's emergency contacts (Plaintiffs) were not notified of this incident. (*Id*. at ¶ 50).

Following his suicide attempts on November 13, 2020, Adams participated in inpatient and outpatient care at the Vanderbilt University Medical Center Psychiatric Hospital.[10] (*Id*. at ¶ 53). Defendant gave Adams a failing grade in the academic courses he did not complete while participating in the inpatient and outpatient care program, rather than putting him on medical leave and marking courses "incomplete." (*Id*. at ¶¶ 54–55). Adams was released from the psychiatric hospital in December 2020 and continued to "report" to the UCC and its staff. (*Id*. at ¶ 56). Adams continued to report to the UCC suicidal ideation and expressed to UCC staff his desire to purchase a firearm. (*Id*. at ¶¶ 57; 114).

Defendant continued to live alone in a dorm during the Spring 2021 semester. (*Id*. at ¶ 57). Throughout the Spring 2021 semester, Adams remained suicidal and again attempted suicide by cutting his wrists while residing in his dorm room.[11] (*Id*. at ¶¶ 58, 61). At some point in time, Defendant medicated Adams but allowed him to continue to live alone in his dorm room.[12] (*Id*. at ¶ 63).

---

[9] It is unclear who or what alerted campus police that Adams had attempted to commit suicide on this occasion.

[10] Defendant represents (and Plaintiffs do not dispute) that Vanderbilt Psychiatric Hospital is a part of Vanderbilt University Medical Center, which is a legal entity separate from Defendant and is not a party to this lawsuit. (Doc. No. 25 at 3).

[11] Notably, the FAC does not allege that Defendant had notice of Adams's Spring 2021 suicide attempt. Therefore, where the FAC alleges that Defendant was aware of Adams's "previous [suicide] attempts," (*id*. at 5, 59, 64, 66, 68, 99, 100, 112, 132, 133, 137), the Court understands this to mean that Defendant was aware of the two suicide attempts that occurred on November 13, 2020, but not the suicide attempt that occurred at some unspecified time in Spring 2021.

[12] The FAC does not clarify when Defendant "medicated" Adams.

In the Summer of 2021, Adams enrolled in summer academic courses and received an increased workload. Adams also moved into a different on-campus dormitory building, but still lived alone. (*Id*. at ¶¶ 64-66). Defendant permitted Adams to stay on campus over the July 4, 2021 holiday weekend. (*Id*. at ¶ 69). On July 4, 2021, after a wellness check requested by a friend, Adams's body was found hanging in his dorm room approximately twenty hours after it is believed the hanging occurred. (*Id*. at ¶¶ 70–71). A medical examiner later ruled Adams's death a suicide by hanging. (*Id*. at ¶ 70). At the time of Adams's suicide, his Resident Advisor (RA) was unaware of his suicidal tendencies and was not advised by Defendant to check on Adams or to take other precautionary measures. (*Id*. at ¶ 73).

Plaintiffs, as Adams's next of kin, brought this action against Defendant alleging that Defendant failed to exercise reasonable care and to adequately guard against a dangerous condition it created by leaving Adams alone in his dorm room. These allegations give rise to Plaintiffs' claims for premises-liability negligence (Count I) and wrongful-death negligence (Count II). Plaintiffs also claim that Defendant discriminated against Adams based on his disability and failed to accommodate Adams's disability in violation of Title III of the Americans with Disabilities Act ("ADA") (Count III) and Section 504 of the Rehabilitation Act ("the Act") (Count IV). Finally, Plaintiffs claim that Defendant breached contractual obligations owed to Adams and Plaintiffs (Count V). In response, Defendant filed the instant Motion, seeking dismissal of all counts.

## LEGAL STANDARD

For purposes of a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take all the factual allegations in the complaint as true, as it has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty.*, 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DISCUSSION

I.    Notice Requirements Prescribed by the THCLA Do Not Bar Plaintiffs' Claims

The Tennessee Health Care Liability Act ("THCLA") imposes certain procedural requirements on plaintiffs asserting a potential claim for health care liability. *See* Tenn. Code §§ 29-26-101(a)(1), (c); 29-26-121, 29-26-122(a). Those procedural requirements are that "any plaintiff 'asserting a potential claim for health care liability' must give pre-suit notice to the

defendants," and that "'[i]n any health care liability action in which expert testimony is required by § 29-26-115, the plaintiff or plaintiff's counsel shall file a certificate of good faith with the complaint.'" *Forsythe v. Jackson Madison Cnty. Gen. Hosp. Dist.*, 2022 WL 17247615, at *4 (Tenn. Ct. App. Nov. 28, 2022) (citing Tenn. Code §§ 29-26-121, 29-26-122(a)). Dismissal with prejudice is the remedy for failure to file a good faith certificate. *Id.* (citing Tenn. Code § 29-26-122(c)(1)).

Defendant argues that despite Plaintiffs' assertions to the contrary, Plaintiffs' claims are health care liability claims and therefore are subject to the THCLA notice requirements. Because (according to Defendant) Plaintiffs did not comply with the THCLA's notice requirements, Defendant asserts, their claims should be dismissed with prejudice.

However, as Defendant has acknowledged, courts have recently expressed doubt on the applicability of the THCLA's pre-suit notice requirements in federal lawsuits. (Doc. No. 37 at 2, n.1). For example, the Sixth Circuit recently held that pre-suit notice requirements under a Michigan state law[13] did not apply to a diversity lawsuit filed in federal court. *Albright v. Christensen*, 24 F.4th 1039, 1045–49 (6th Cir. 2022). Subsequently, in *Smith v. Corecivic, Inc.*, the plaintiffs argued that the holding in *Albright* should apply with equal force to bar the application of the THCLA's similar requirements to federal lawsuits. 618 F. Supp. 3d 695, 699 (M.D. Tenn. 2022). In *Smith*, Judge Trauger agreed, stating:

> Under *Albright*, it is clear that the presuit notice requirement set forth in Tenn. Code Ann. § 29-26-121(a)(1) and the certificate of good faith requirement in Tenn. Code Ann. § 29-26-122(a) conflict with the Federal Rules of Civil Procedure. As such, they must give way to the Federal Rules and, therefore, do not apply to health care liability claims filed in federal court.

---

[13] The pre-suit notice requirements under the Michigan state law at issue in the case discussed below (*Albright v. Christensen*, 24 F.4th 1039 (6th Cir. 2022)) mandated that an affidavit-of-merit signed by a health care professional be filed with a medical malpractice complaint and that pre-suit notice be provided to the defendant in a medical malpractice action.

*Smith*, 618 F. Supp. 3d at 706.

The undersigned agrees with Judge Trauger's analysis. In reaching this conclusion, the undersigned finds particularly convincing (as did Judge Trauger) the Sixth Circuit's approval of the Fourth Circuit's analysis of a West Virginia law containing pre-suit notice requirements similar to those prescribed by THCLA. *See Albright*, 24 F.4th at 1047–48. The Fourth Circuit found the West Virginia statute to conflict with the Federal Rules of Civil Procedure. *Pledger v. Lynch*, 5 F.4th 511, 523–24 (4th Cir. 2021). The fact that the Sixth Circuit referenced and relied on the Fourth Circuit's analysis and conclusion with respect to the similarly structured West Virginia law demonstrates the Sixth Circuit's "willingness to extend the holding [in *Albright*] to analogous statutory schemes" like the THCLA. *Smith*, 618 F. Supp. 3d at 704.

Accordingly, the Court need not determine whether Plaintiffs' claims fall within the THCLA because even if they do, Plaintiffs are not required to comply with the notice requirements set forth in the THCLA in order to proceed with the instant federal lawsuit. Thus, the THCLA does not bar Plaintiffs' claims.

II.    Count II: Wrongful Death - Negligence[14]

To state a claim for negligence,[15] a plaintiff must allege: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach

---

[14] The Court begins its analysis with Count II because Count I (premises-liability negligence) includes all of the elements required for Count II, plus the additional element of a dangerous or unsafe condition on the property. Accordingly, the Court finds it appropriate to begin by analyzing the negligence claim (Count II) before separately addressing the additional element needed to establish the premises-liability claim in Count I.

[15] Although Plaintiffs bring claims for "Wrongful Death Negligence" (Count II) and "Wrongful Death Negligence – Premises Liability" (Count I), the Court's analysis and conclusions herein are not wrongful-death specific. Rather, they are applicable more broadly to negligence generally.

of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019) (internal quotations omitted).

Plaintiffs allege that Defendant owed Adams a "standard duty of care" or "duty of ordinary and reasonable care" as an enrolled student residing on campus. (Doc. No. 8 at ¶ 128). In addition, Plaintiffs allege that Defendant "arguably owed Mr. Adams a heightened duty of care" based on a "special relationship" between Defendant and Adams arising from his status as a full-time student required to reside on campus and Defendant's "actual and constructive knowledge of Mr. Adams's suicidal tendencies, thoughts, and ideations, and previous suicide attempts." (*Id*. at ¶¶ 129, 133). Defendant argues in response that the FAC fails to allege facts sufficient to establish that Defendant owed Adams a "heightened" duty of care because no "special relationship" existed to form the basis for a heightened duty of care.[16]

Moreover, Defendant argues that to the extent that it did owe Adams a standard duty of care, Plaintiffs have not adequately alleged that Defendant breached that duty; Defendant argues that a breach on its part is not plausibly suggested by its placing Adams in his dorm alone without implementing or initiating policies to guard against Adams committing suicide, failing to contact his emergency contacts, and failing to direct Adams to appropriate clinical care, (Doc. No. 25 at 10) (referring to Doc. No. 8 at ¶¶ 130-131, 135-137), because the standard duty of care does not generally impose an affirmative duty to act for the protection of another. (Doc. No. 25 at 11). Finally, Defendant asserts that Plaintiffs have not alleged facts sufficient to establish that Defendant's breach was the actual or proximate cause of Adams's suicide.

The Court begins its analysis by assessing whether Plaintiffs have alleged facts plausibly suggesting that Defendant owed Adams a duty of care—and if so, whether such duty owed was

---

[16] Defendant does not appear to dispute that it owed Adams a standard duty of care.

"heightened" or "standard." "Whether the defendant owed the plaintiff a duty of care is a question of law to be determined by the court."[17] *Staples v. CBL & Assoc., Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000) (citing *Rice v. Sabir*, 979 S.W.2d 305, 309 (Tenn. 1998)). The Tennessee Supreme Court has stated that "[i]n general, all persons have a duty 'to use reasonable care to refrain from conduct that will foreseeably cause injury to others.'" *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997)). It is beyond question that Defendant owed Adams this standard duty of care, and Defendant does not dispute this. However, as Defendant notes, "[t]he general duty of care does not include an affirmative duty to act for the protection of another . . . '*unless* the defendant stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'"[18] *Id*. at 478-79 (citing *Turner*, 957 S.W.2d at 818) (internal citations omitted). This exception, known as the "special relationship doctrine," recognizes that "certain socially recognized relations exist which constitute the basis for such legal duty." *Id*. at 479 (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 871 (Tenn. 1993)). Thus, while "an actor is always bound to prevent his acts from creating an unreasonable risk to others, he is under the affirmative duty to

---

[17] Notably, the parties spend most of their briefing discussing the element of proximate cause. While both duty and proximate cause turn in large part on the question of foreseeability, proximate cause is a question of fact generally left to the jury to decide whereas the existence of a legal duty is a question of law to be decided by the Court. *Compare Tumminello v. Fr. Ryan High Sch., Inc*., 678 F. App'x 281, 288 (6th Cir. 2017) ("Proximate causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome" (quoting *Frady v. Smith*, 519 S.W.2d 584, 586 (Tenn. 1974))) *with Staples v. CBL & Assoc., Inc*., 15 S.W.3d 83, 89 (Tenn. 2000) ("Whether the defendant owed the plaintiff a duty of care is a question of law to be determined by the court.").

Because the Court concludes that, as a matter of law, Plaintiffs have not stated facts sufficient to establish that Defendant owed Adams an affirmative duty necessary to state a claim for negligence, the Court need not address the issue of proximate causation—even to the extent the Court may do so.

[18] Defendant appears to use the term "general duty of care" synonymously with Plaintiffs' use of "standard duty of care." Herein, the Court adopts Plaintiffs' use of "standard duty of care" as referring to the duty of care articulated by the Tennessee Supreme Court in *Biscan*.

act to prevent another from sustaining harm only when certain socially recognized relations exist which constitute the basis for such legal duty." *Turner*, 957 S.W.2d at 818 (quoting *Bradshaw*, 854 S.W.2d at 871).

The Tennessee Supreme Court "ha[s] previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (citing *Bradshaw*, 854 S.W.2d at 872) (imposing liability on physician for failing to warn wife of patient of the foreseeable risks emanating from a patient's illness)[19]; *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 899–900 (Tenn. 1996) (imposing a duty upon businesses to take reasonable measures to protect their customers from foreseeable criminal attacks); *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 860 (Tenn. 1985) (holding that a social host had a duty to aid to his guest when the guest was injured and rendered unconscious); Restatement (Second) of Torts § 314A (listing the relationships described by the court in *Downs*). But Tennessee courts (including the Tennessee Supreme Court) have stated that the kinds of relationships specifically articulated in *Downs* are not the only relationships that will give rise to an affirmative duty of care; other kinds of relationships also may do so.[20] *Biscan*, 160 S.W.3d at 479, n.4; *see also Riggs v. Wright*, 510 S.W.3d 421, 427-48 (Tenn. Ct. App. 2016) ("This Court has indicated, however, that these recognized special relationships are 'not exhaustive.'" (quoting

---

[19] Though the court in *Downs* cited to *Bradshaw* as a case in which the Tennessee Supreme Court has recognized the existence of a special relationship, *Bradshaw* did not involve any of the types of relationships specifically listed in *Downs*. Rather, as indicated by the parenthetical above, the court in *Bradshaw* recognized for the first time the existence of a special relationship between a physician and a family member of the physician's patient.

[20] The relationship between a physician and a family member of the physician's patient (as was at issue if *Bradshaw*) is one such kind of relationship.

*Main St. Mkt., LLC v. Weinberg*, 432 S.W.3d 329, 337 (Tenn. Ct. App. 2013))). As discussed in detail below, the Tennessee Supreme Court considers, among other factors, public policy and the foreseeability of harm when deciding whether a particular kind of relationship has the status of "special relationship" giving rise to an affirmative duty of care.

Plaintiffs argue that Defendant owed Adams an affirmative[21] duty of care in this case based on a special relationship that (according to Plaintiffs) exists between a university and an enrolled student when the university requires the student to live on campus. (Doc. No. 8 at ¶¶ 121, 129; Doc. No. 32 at 17-19). The FAC asserts that due to this (alleged) special relationship, Defendant was required to "take necessary measures to guard against the foreseeable harm presented to Mr. Adams while residing on campus as [a] student under the care, custody, and control of [Defendant]." (Doc. No. 8 at ¶ 133). However, Plaintiffs do not deny that no Tennessee court has recognized a special relationship between an adult student and the university at which the student is enrolled.[22] Despite this, Plaintiffs urge the Court to recognize a special relationship and resulting

---

[21] Although Plaintiffs do not use the word "affirmative" in either the FAC or their briefing, it is clear from the FAC's allegations—most if not all of which refer to Defendant's "failure" to take certain actions (e.g., failure to notify Adams's emergency contacts and failure to implement appropriate suicide protocols, (Doc. No. 8 at ¶¶ 135-36)—that Plaintiffs believe Defendant had a legal duty to affirmatively take steps to aid or protect Adams. Plaintiffs refer to this as a "heightened duty of care."

   Moreover, whether the Court notes that whether Defendant owed Adams a "heightened" duty of care (*i.e.*, an affirmative duty to protect him from harm), as opposed to a "standard" duty of care (which would not include any affirmative duty) depends on whether a special relationship existed between Defendant and Adams. Although Plaintiffs have alleged that a special relationship existed between Defendant and Adams, the Court does not accept that legal conclusion as true for purposes of the instant Motion. Rather, the Court must determine whether the FAC alleges facts plausibly suggesting that (as a matter of Tennessee law) Defendant had a special relationship with Adams.

[22] As noted, the Tennessee Supreme Court has not addressed whether a special relationship exists between a student (be it one required to live on campus or one not required to live on campus) and a college or university (be it one that knows about the student's suicidal thoughts or one that does not know about the student's suicidal thoughts). However, the Sixth Circuit—applying Tennessee law—has at least twice declined to find the existence of a special relationship between a student and the student's middle school or high school. *See Tumminello*, 678 F. App'x at 286; *Stiles v. Grainger Cnty. Sch.* 819 F.3d 834 (6th Cir. 2016).

affirmative duty of care under the specific facts of this case—namely where a university requires a student to live on campus, the student has reported suicidal thoughts to the university, and the student has previously attempted suicide.

A.       ***Erie*-Guess Analysis, Generally**

Because Tennessee courts (including the Tennessee Supreme Court) have not spoken on this issue, the Court must render a so-called "*Erie* guess" as to how the Tennessee Supreme Court would rule if confronted with the issue of whether a special relationship exists under the above-referenced facts of this case ("applicable special-relationship issue").

Where, as here, federal jurisdiction is based on diversity, this Court applies the substantive law of the forum state—in this case, Tennessee. *Savedoff v. Access Grp., Inc*., 524 F.3d 754, 762 (6th Cir. 2008) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). When resolving an issue of state law, "we look to the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc*., 714 F.3d 355, 358–59 (6th Cir. 2013). "Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Savedoff*, 524 F.3d at 762. Neither the Tennessee Supreme Court nor the Tennessee Court of Appeals has directly addressed the applicable special-relationship issue. Accordingly, we must "consider all relevant data, including jurisprudence from other jurisdictions," *Combs v. Int'l Ins. Co*., 354 F.3d 568, 577 (6th Cir. 2004) (internal citations and quotation marks omitted), and we must "make [the] best prediction, even in the absence of direct state court precedent, of what the [Tennessee] Supreme Court would do if it were confronted with this question," *Managed Health*

*Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000) (first alteration in original) (quoting *Welsh v. U.S.*, 844 F.2d 1239, 1245 (6th Cir. 1988)).

In conducting its *Erie*-guess analysis, the Court will first examine existing Tennessee law, then examine jurisprudence from other jurisdictions.

B. **Existing Tennessee Law Does Not Support Recognizing a Special Relationship in This Case.**

Existing Tennessee law regarding special relationships giving rise to an affirmative duty of care does not indicate that the Tennessee Supreme Court would resolve the applicable special relationship issue in Plaintiffs' favor, *i.e.*, would recognize a special relationship between a university and its adult student, even under the specific facts of this case.

In deciding whether a special relationship exists in any given situation, the Tennessee Supreme Court has directed courts to first "weigh public policy considerations, which 'are crucial in determining whether a duty of care existed in a particular case.'" *Biscan*, 160 S.W.3d at 479 (quoting *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003)). Public policy, however, is not the only consideration relevant to whether a special relationship exists; the court must also "consider whether the plaintiff's injuries and the manner in which they occurred were reasonably foreseeable." *Id.* (citing *Burroughs*, 118 S.W.3d at 329). Finally, the court must consider whether the remaining factors of the balancing test generally used to determine whether a defendant owed a duty of care to a particular plaintiff favor imposition of an affirmative duty of care. *Id.* at 480. Those factors include:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Id*. at 479.[23]

Before applying this law to the facts presented here, the Court finds it necessary to clarify a point of potential confusion that could arise from the above case law. As noted, when deciding whether to impose a special relationship giving rise to an affirmative duty of care, the Tennessee Supreme Court instructs courts to determine whether a special relationship exists between the relevant parties. If so, then imposing an affirmative duty of care on the defendant is appropriate based on the special relationship. This approach is consistent with the special-relationship doctrine as articulated by the Tennessee Supreme Court, *i.e.*, that a defendant owes no affirmative duty of care "*unless* the defendant stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'"[24] *Biscan*, 160 S.W.3d at 478-79 (citing *Turner*, 957 S.W.2d at 818) (internal citations omitted).

In practice, however, the Tennessee Supreme Court seems to conduct this analysis in reverse order. That is to say, instead of analyzing whether a special relationship exists between the parties (and, if so, imposing an affirmative duty of care on the defendant), the Tennessee Supreme Court generally frames its analysis (either explicitly or implicitly) in terms of whether public policy favors imposing an affirmative duty of care on the defendant in the particular case at issue (despite the fact that Tennessee law has not previously recognized a special relationship on those

---

[23] In the instant case, most of these "remaining" factors are either inapplicable or addressed in the Court's broader analysis of public policy. For example, the importance or social value of the activity engaged in by the defendant and the usefulness of the conduct to defendant are not relevant factors here, given that the issue before the Court is Defendant's inaction rather than its potentially harmful conduct. Moreover, the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct, the relative usefulness of the safer conduct, and the relative safety of alternative conduct are all factors addressed within the Court's public policy analysis. Therefore, the only remaining factor for the Court to consider is the possible magnitude of the potential harm or injury.

[24] Defendant appears to use the term "general duty of care" synonymously with Plaintiffs' use of "standard duty of care." Herein, the Court adopts Plaintiffs' use of "standard duty of care" as referring to the duty of care articulated by the Tennessee Supreme Court in *Biscan*.

facts) and whether it was foreseeable that the harm might occur. If public policy does favor imposing an affirmative duty of care (and the harm is deemed foreseeable), then the Tennessee Supreme Court declares that a special relationship exists and imposes an affirmative duty of care on the basis of that special relationship. So, instead of first deciding whether a special relationship exists based on the nature of that relationship (and imposing (or not imposing) an affirmative duty of care based on the answer to that question), the Tennessee Supreme Court first decides whether an affirmative duty of care is appropriate under the circumstances of the case (based on the relevant factors, including public policy and foreseeability of harm). If the Tennessee Supreme Court concludes that imposing an affirmative duty of care is appropriate, then the Tennessee Supreme Court declares that a special relationship exists (and that special relationship then serves as the purported justification for imposing an affirmative duty of care that the court already determined *ought* to be imposed).[25] Another way to describe the Tennessee Supreme Court's approach would be that in order to decide whether a special relationship exists, the Tennessee Supreme Court first decides whether public policy favors imposing an affirmative duty of care and whether the harm was foreseeable.

For example, in *Biscan*, the Tennessee Supreme Court considered whether a social host who knowingly permitted and facilitated the consumption of alcohol by his minor guests owed his guests an affirmative duty of care to protect them from foreseeable harm.[26] *Id*. at 478-81. To

_____

[25] As shown below, at times, the Tennessee Supreme Court explicitly frames its inquiry in terms of whether the relevant factors support imposing an affirmative duty of care. Other times (even within the same case), the Tennessee Supreme Court frames its inquiry in terms of whether the factors favor finding a special relationship. But even where the Tennessee Supreme Court purports to frame its analysis in terms of whether the factors favor finding a special relationship, it is clear that the Court's actual concern is whether it ought to impose an affirmative duty of care on the facts of that particular case.

[26] Specifically, the court considered whether the host (the defendant) owed an affirmative duty to protect his minor guests from injuries caused by other minors who consumed alcohol at the party. *Id*. at 468.

determine whether the host owed his guests an affirmative duty of care, the Tennessee Supreme Court stated that it must "first inquire whether [the host] stood in some special relationship to [his guests]." *Id*. at 480. Specifically, the Tennessee Supreme Court stated that it would "begin by considering whether public policy favors a determination that the adult host . . . had a sufficient relationship to all of his minor guests . . . such that he had a duty of care to each of them." *Id*. Although the Tennessee Supreme Court initially framed its inquiry in terms of whether public policy favored a determination that the host had a *special relationship* with his guests, the Tennessee Supreme Court's analysis did not focus on the nature of the parties' relationship; instead, the analysis focused on whether public policy favored imposing an affirmative duty in this type of situation.[27] *Id*. After evaluating the relevant policy considerations, the Tennessee Supreme Court concluded, "[i]n addition to these unambiguous legislative pronouncements, public policy considerations *favor imposing a duty to act* for the protection of minors where such a duty might

---

[27] The Tennessee Supreme Court's analysis stated, in full:

> First, the legislature has made the public policy determination that minors are generally prohibited from consuming alcohol. *See, e.g.,* Tenn. Code Ann. § 57–4–203(b) (2002) (making it illegal for minors to purchase alcohol and for any person to sell or furnish a minor with alcohol); Tenn. Code Ann. § 57–5–301(e)(1) (2002) (making it illegal for minors to possess beer "for any purpose"). It is also the public policy of this state to prohibit persons under the influence of alcohol from driving. *See, e.g.,* Tenn. Code Ann. §§ 55–10–401 to –416 (2002). In addition to these unambiguous legislative pronouncements, public policy considerations favor imposing a duty to act for the protection of minors where such a duty might be absent when dealing with adults. We have long recognized that, because of their immaturity and inexperience, a duty may exist towards minors where it might not exist towards adults. *See Townsley v. Yellow Cab Co.*, 145 Tenn. 91, 237 S.W. 58 (1922); *see also Hawkins* \*481 *County v. Davis*, 216 Tenn. 262, 391 S.W.2d 658 (1965); *Gritzner v. Michael R.*, 228 Wis.2d 541, 598 N.W.2d 282, 288 (App.1999) ("it [is] self-evident that an adult who voluntarily takes on the supervision, custody or control, even on a temporary basis, of a visiting child ... stands in a special relationship to such child ..."). In sum, public policy considerations clearly favor finding that Worley had a special relationship to his minor guests such that he had a duty to ensure their safety, as well as to prevent them from driving while intoxicated.

*Id*. at 480-81.

be absent when dealing with adults." *Id*. (emphasis added). Just two sentences later, the Tennessee Supreme Court stated, "[i]n sum, public policy considerations clearly favor finding that [the host] *had a special relationship* to his minor guests such that he had a duty to ensure their safety, as well as to prevent them from driving while intoxicated." *Id*. at 481 (emphasis added). This analysis (and particularly the order in which it occurred) demonstrates what the Court explained above: the decision of whether public policy favors *imposing an affirmative duty* drives the Tennessee Supreme Court's decision of whether to find a special relationship—not the other way around.[28]

The Tennessee Supreme Court continued its analysis by finding that it was foreseeable that guests would drink and drive, and that guests would ride with drivers who had been drinking. *Id*.

---

[28] The Tennessee Supreme Court's analysis in other cases similarly suggests that its primary concern in deciding whether to impose an affirmative duty of care is not simply the nature of the relationship between the parties (*i.e.*, whether they stand in "special relationship" to one another), but whether it is prudent (as a matter of public policy and based on the foreseeability of harm) to impose an affirmative duty based on the parties' relationship.

In *Downs*, for example, the plaintiff urged the Tennessee Supreme Court to recognize that one of the defendants (Britt) stood in a special relationship with the decedent (as the decedent's best friend and roommate) giving rise to an affirmative duty to exercise reasonable care to protect the decedent from harm. 263 S.W.3d at 823. The Tennessee Supreme Court rejected this argument, stating that "it is not in *the public's interest* to impose on [Britt] an affirmative duty to aid or protect [the decedent] solely because he was [the decedent's] best friend and roommate." *Id*. (emphasis added).

And in *McClung*, the Tennessee Supreme Court held that that a business has a duty to take reasonable measures to protect its customers from foreseeable criminal attacks. 937 S.W.2d at 899. In reaching this conclusion, the Tennessee Supreme Court weighed "the foreseeability of harm and the gravity of harm" against "the commensurate burden imposed on the business to protect against that harm." *Id*. at 901. The Tennessee Supreme Court also discussed at length the benefits of employing this "balancing approach" as compared to approaches used by other courts dealing with the same issue (for example, the "prior incidents rule" or the "totality of the circumstances" approach). *Id*. at 899-902. But the Tennessee Supreme Court in *McClung* did not analyze the nature of the relationship between the parties in an effort to determine whether it was "special." The term "special relationship" appeared only once in the opinion, in reference to a quote from a prior case. *Id*. at 895. Nevertheless, the Tennessee Supreme Court found it appropriate to impose an affirmative duty of care and has subsequently cited *McClung* as an example of a case in which it has recognized a special relationship. *See Downs*, 263 S.W.3d at 820 ("We have previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another.") (citing *McClung*, 937 S.W.2d at 895).

at 481. Additionally, the Tennessee Supreme Court concluded that the remaining factors mentioned above weighed in favor of imposing an affirmative duty on the host. *Id*. at 482.

The undersigned would sum it up this way: although the primary question in these situations ostensibly is whether a "special relationship" exists between one party and another party, in reality the primary question is whether policy considerations—considerations that entirely transcend the nature of the relationship at issue—support imposing a heightened duty of care upon the one party towards the other party. And if the answer to the latter question is yes, then the label of "special" is placed upon the relationship at issue. So the label "special relationship" does not actually serve as a pronouncement about the relationship at issue, but rather is shorthand—a proxy—for a pronouncement that (for policy reasons) one party in the relationship should have a heightened susceptibility to liability for the other party's injuries and thus should be saddled with a heightened duty of care towards the other party. Decades ago, the undersigned expressed concern about this kind of reasoning—where courts purport to be inquiring into a narrower question of whether the circumstances of a particular case can be pigeonholed to fit a particular term (here, special relationship), when in fact they are inquiring into broader question that actually does not turn at all on whether those circumstances actually fit that term.[29] Here, though, the undersigned

---

[29]"In short, at any stage of [a particular] analysis, a court might switch its focus from the terms of the black-letter rule[ ] to the broader inquiry into whether [a particular result that ostensibly turns on whether words of the rule apply given the case-specific circumstances] would be appropriate." Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 83 (1995). This is because courts are not necessarily interested in whether the facts of a particular case can be pigeonholed to say that they establish the applicability of a particular defined term, and instead care about whether the result that flows from finding such applicability would be a good result. *See id.* at 82 (noting that when the possibility of issue preclusion arises in a particular case depending upon whether there is some prior "final judgment," some courts "simply are not interested in whether the prior judgment is 'final.' Rather, they are interested in whether [issue] preclusion is desirable [in the case the hand]. Thus, they use the purported technical requirement [for issue preclusion to apply] of a final judgment as a device for shifting their focus to whether preclusion is desirable [in the case at hand].").

Relatedly, quoting the same article, the undersigned more recently has noted that "courts sometimes interpret a single phrase in multiple ways depending on the context; that is, the phrase will be construed

will call (and apply) Tennessee law as he sees it based on his "*Erie* guess," irrespective of any concerns he may harbor about the soundness of it and of how it is applied in practice.

Under the *Erie*-guess framework, the Court here is tasked with determining whether the Tennessee Supreme Court would find that a special relationship exists between Adams and Defendant based on the facts of this case. But as explained above, what that really means is the Court must determine whether the Tennessee Supreme Court would find it appropriate to impose on Defendant an affirmative duty of care to protect Adams from committing suicide. Therefore, consistent with the Tennessee Supreme Court's analysis as applied in *Biscan*, the Court will first assess whether public policy favors imposing an affirmative duty of care on Defendant based on the circumstances of this case. Then, the Court will evaluate the foreseeability of harm. Finally, the Court will determine whether the possible magnitude of the potential harm or injury[30] supports imposing an affirmative duty of care.

Regarding public policy, there is obviously a strong interest in preventing suicide, especially among young adults like Adams. As Plaintiffs point out, suicide has been recognized in recent years as a leading cause of death for college students. (Doc. No. 32 at 18) (citing Trends and Prevalence of Suicide of College Students 2017-2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9375853/). Moreover, at first glance, universities

---

one way in a particular context to achieve a particular result in that context, but then construed a different way in another context to achieve a different result." *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 690 (M.D. Tenn.), *aff'd on other grounds*, 978 F.3d 378 (6th Cir. 2020).

Applied to the present context, this all means that courts well may be determining whether the phrase "special relationship" should be deemed applicable in a particular case based *not* on a consistent methodology for construing the phrase, but rather on their view as to what the right outcome is (*i.e.*, as to whether a heightened duty of care/heightened prospect of liability should be imposed upon one party to the relationship).

[30] As noted above, the possible magnitude of the potential harm or injury is the only "remaining factor" that is both applicable to this case and not addressed in the policy analysis.

appear to be well-positioned to prevent suicide of their students. *See Regents of Univ. of California v. Superior Ct.*, 4 Cal. 5th 607, 625, 413 P.3d 656 (2018) ("Students are comparatively vulnerable and dependent on their colleges for a safe environment. Colleges have a superior ability to provide that safety with respect to activities they sponsor or facilities they control").

However, the Court must also account for countervailing policy considerations weighing against imposing an affirmative duty on universities to prevent student suicide. Among these is the concern that imposing such a duty could create perverse incentives for both university administrators and students. *See* Ann MacLean Massie, *Suicide on Campus: The Appropriate Legal Responsibility of College Personnel*, 91 Marq. L. Rev. 625, 674 (2008). Administrators concerned about their schools being held liable for a student's suicide may avoid engaging with students in a manner that might otherwise prove beneficial to the student's mental health. For example, a professor or resident advisor might avoid reaching out to a student who seems to be struggling with their workload amidst a family tragedy. Similarly, a student who knows that university personnel have a duty to act on information about the student's suicidal ideation might be inclined to conceal his or her mental health struggles for fear that the university staff will disclose that information to a third-party in attempting to fulfill that duty.

Moreover, imposing a duty to act on a university also raises privacy concerns that could lead to similar withholding of information by students. Another concern might be imposing a duty to act on university personnel that is not qualified to decide the best course of action for the student to take. Non-clinicians cannot be expected to probe or discern suicidal intentions that are not expressly evident, and universities should not be held liable for failing to identify hidden signs of intention to harm oneself.

There are also financial issues that would predictably arise from imposing liability on universities for suicides that occur by their students. The costs to mitigate this liability (or the risk thereof) likely would be substantial, potentially in the form of, for example, additional insurance premiums and the cost of hiring additional personnel. And these costs likely would not be problematic only for the universities themselves. The economic burden placed on defendant universities would likely be spread among all students (or at least among the individuals financing those students' tuition) in the form of increased tuition and/or fees.

Finally, imposing an affirmative duty of care on universities with respect to protecting their own students would run counter to the primary mission of universities. As one court has stated:

> The university's responsibility to its students, as an institution of higher education, is to properly educate them. It would be unrealistic to impose upon a university the additional role of custodian over its adult students and to charge it with the responsibility for assuring their safety and the safety of others. Imposing such a duty of protection would place the university in the position of an insurer of the safety of its students.

*Rabel v. Illinois Wesleyan Univ.*, 161 Ill. App. 3d 348, 361 (1987). Another court has expressed similar sentiments in rejecting the notion that a university had a duty to its students to guard against the consequences of alcohol abuse, stating:

> [C]olleges and universities are educational institutions, not custodial. Their purpose is to educate in a manner which will assist the graduate to perform well in the civic, community, family, and professional positions he or she may undertake in the future. It would be unrealistic to impose upon an institution of higher education the additional role of custodian over its adult students and to charge it with responsibility for preventing students from illegally consuming alcohol and, should they do so, with responsibility for assuring their safety and the safety of others. Fulfilling this charge would require the institution to babysit each student, a task beyond the resources of any school. But more importantly, such measures would be inconsistent with the nature of the relationship between the student and the institution, for it would produce a repressive and inhospitable environment, largely inconsistent with the objectives of a modern college education.

*Beach v. Univ. of Utah*, 726 P.2d 413, 419 (Utah 1986) (internal citations omitted).

Thus, the policy considerations do not necessarily counsel in favor of imposing on Defendant an affirmative duty of care.

The Court must also consider the foreseeability of Adams's injuries. As to foreseeability, the FAC alleges the following facts (which the Court accepts as true for purposes of the instant Motion): Defendant was aware that Adams had twice attempted suicide, each time approximately eight months prior to his eventual suicide in July 2021;[31] Adams sought counseling from the UCC and expressed suicidal thoughts on several occasions as early as November 2020 and continued to "report" his suicidal thoughts into the Spring 2021 semester; Adams received in-patient and out-patient treatment in relation to his suicidal thoughts; Defendant failed to notify Adams's emergency contacts (Plaintiffs) or take any subsequent remedial measures to prevent future attempts against his life; and Defendant failed Adams in his academic courses, rather than placing him on medical leave and marking his courses "incomplete." (Doc. No. 8 at ¶¶ 118-20, 130-33).

The Tennessee Supreme Court's reasoning in *Cotten v. Wilson* suggests that the Tennessee Supreme Court would not find Adams's suicide to have been reasonably foreseeable to Defendant based on the above facts. 576 S.W.3d 626 (Tenn. 2019). In *Cotten*, the ex-husband (the plaintiff) of a woman (the decedent) who died by suicide sued the decedent's boyfriend (the defendant) for wrongful-death negligence. *Id*. at 633. The plaintiff alleged that the defendant boyfriend caused the decedent's death by his negligent maintenance and storage of the firearm she used to kill herself. *Id*. at 633-34. Specifically, the plaintiff claimed that the defendant boyfriend was negligent by showing the decedent his gun, subsequently telling her that he was interested in pursuing a relationship with another woman, and then allowing her to stay in his house two weeks later by

---

[31] Importantly, both of the attempts of which Defendant allegedly was aware occurred on the same day, November 13, 2020. (Doc. No. 8 at ¶ 45). The FAC does not allege that Defendant was aware of Adams's subsequent suicide attempt (by cutting his wrists) that occurred at some point during the Spring 2021 semester.

herself without removing or securing the gun, all while knowing that she was in a fragile mental state. *Id*. at 650. Although the defendant boyfriend was aware that the decedent had previously attempted suicide, the Tennessee Supreme Court found that the decedent's suicide was not reasonably foreseeable to the defendant during the relevant time period. *Id*. at 650. In reaching this conclusion, the court relied on the fact that the defendant's allegedly negligent conduct did not occur until almost nine months after the decedent's prior suicide attempt and that the record contained no facts indicating that the decedent was "having an outsized, suicidal response to the various stressors in her life" around the time the defendant engaged in his allegedly negligent conduct. *Id*. at 651. Thus, the Tennessee Supreme Court stated, "[e]ven for a defendant who is aware of a decedent's past suicide attempt and mental health issues, there must be facts in the record that would have put the defendant on notice that suicide was a reasonably foreseeable probability *at the time of the allegedly negligent acts*." 576 S.W.3d at 653.

Here, the FAC lacks factual allegations suggesting that Defendant had notice that Adams was actively contemplating suicide at or around the time the suicide actually occurred. Although the FAC alleges that Defendant was aware of Adams's November 2020 suicide attempts, the FAC does not allege that Defendant was aware of the Adams's subsequent suicide attempt (by cutting his wrists) that occurred at some point during the Spring 2021 semester. Thus, even if Adams's suicide would have been reasonably foreseeable to Defendant during the fall of 2020 (and shortly thereafter) because of his prior attempts, it would not have remained reasonably foreseeable eight months later. And while the FAC alleges vaguely that Adams continued "reporting" suicidal thoughts in the Spring 2021 semester (Doc. No. 8 at ¶ 57), the FAC does not state to whom those thoughts were reported or how late into the Spring they were reported.

Accordingly, the Court concludes based on *Cotten* that the Tennessee Supreme Court would not be likely to find that Adams's death was foreseeable to Defendant at the time it occurred.[32]

Finally, although the possible magnitude of the potential harm or injury is great in the context of suicide, Tennessee law requires balancing "the foreseeability and gravity of the potential harm against the burden imposed in preventing that harm." *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998). If the burden is not "onerous," the court must consider "whether the burden outweighs the foreseeability and gravity of the potential harm, so as to preclude an imposition of a duty on the part of the defendants." *Estes v. Peels*, No. E199900582COAR3CV, 2000 WL 1424808 (Tenn. Ct. App. Sept. 21, 2000) (citing *McClung*, 937 S.W.2d at 904). Though the gravity (or magnitude) of potential harm here is great, the foreseeability of harm is not (for the reasons stated above). And, as evidenced by the discussion of policy above, the burden imposed on Defendant to prevent the harm would likewise be significant. In light of this, the Court cannot conclude that the magnitude of potential harm alone would outweigh the lack of foreseeability and the heavy burden imposed on Defendant to prevent the harm.

Therefore, Tennessee law does not support imposing on Defendant an affirmative duty of care in this case.

---

[32] The Court acknowledges that the Tennessee Supreme Court's foreseeability analysis in *Cotten* was made in relation to the element of proximate cause, not the element of duty, and that the concept of foreseeability plays a different role in the context of duty than it does in the context of proximate causation. *See Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 366-67 (Tenn. 2008). But the Court sees no reason why it would be inappropriate to consider the foreseeability analysis in *Cotten* to provide insight into whether the Tennessee Supreme Court would have found Adams's suicide to have been reasonably foreseeable to Defendant for purposes of the "duty" analysis. In *Satterfield*, the Tennessee Supreme Court stated that courts evaluating foreseeability in the context of determining whether a duty exists "are simply ascertaining 'whether [the] defendant was obligated to be vigilant of a certain sort of harm to the plaintiff.'" *Id.* at 367 (quoting John C.P. Goldberg & Benjamin C. Zipursky, *The Restatement (Third) and the Place of Duty in Negligence Law*, 54 Vand. L. Rev. 657, 728-29 (2001)). Although made in the context of proximate causation, the Tennessee Supreme Court's foreseeability analysis in *Cotten* speaks directly to the question of whether the defendant was obligated to protect the plaintiff from committing suicide.

C.     **Case Law From Other Jurisdictions Does Not Support Finding A Special Relationship.**

As stated above, when making an *Erie* guess a federal court must "consider all relevant data, including jurisprudence from other jurisdictions," in order to determine how the Tennessee Supreme Court would be most likely to handle the relevant issue. *Combs,* 354 F.3d at 577 (internal citations and quotation marks omitted). In evaluating cases from other jurisdictions, the Court recognizes a decision from the Eighth Circuit, in which the Eighth Circuit declined to hold that students have a special relationship with their university that gives rise to an affirmative duty of care. *See Freeman v. Busch*, 349 F.3d 582, 588 (8th Cir. 2003). While acknowledging that exceptions may exist in very limited circumstances—none of which apply here—the court in *Freeman* held that "the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students." *Id*. at 587-88. The court reached this conclusion after evaluating cases from across the country demonstrating a general resistance by courts to recognize a special relationship between a university and its students.[33] *See id*. (citing *Bradshaw v. Rawlings*, 612 F.2d 135, 138–40 (3d Cir. 1979) (holding that the era of colleges and universities "assum[ing] a role In loco parentis" is bygone and that therefore there no longer is a special relationship between a college and its students); *Booker v. Lehigh Univ.,* 800 F. Supp. 234, 237–41 (E.D. Pa. 1992) (finding no special relationship); *Nero v. Kan. St. Univ.*, 861 P.2d 768, 778 (1993) (same); *Univ. of Denver v. Whitlock*, 744 P.2d 54, 59–61 (Colo. 1987) (en banc) (same); *Eiseman v. State*, 511 N.E.2d 1128, 1136–37 (N.Y. 1987) (same); *cf. Garofalo v. Lambda Chi Alpha Fraternity,* 616 N.W.2d 647, 654 (Iowa 2000) (analogizing the

---

[33] In addition to the cases cited here, the Court above cited two state court cases—one from Utah, and another from Illinois—in which the courts declined to find a special relationship between a university and its students. *See Beach*, 726 P.2d at 419; *Rabel*, 161 Ill. App. 3d at 361.

lack of a custodial relationship between a university and its students to the lack of a custodial relationship between a national fraternity chapter and its members)).

Perhaps the case most comparable[34] to this one comes from a federal district court in Virginia, wherein the court—applying Virginia law—denied a motion to dismiss a wrongful-death claim brought against a college by the estate of a former student who committed suicide. *Schieszler v. Ferrum Coll.*, 236 F. Supp. 2d 602 (W.D. Va. 2002). There, the district court held that the Virginia Supreme Court might find that a special relationship existed based on the university's knowledge of the decedent's prior emotional problems, threats to kill himself, and self-inflicted bodily injury. *Id*. at 609. However, several key facts that led to the holding in *Schieszler*—which that court expressly limited to its facts—are materially distinguishable from this case. First, in *Schieszler*, the university knew, "within days [before] his death," that the plaintiff was found by campus police with bruises on his head that he claimed were self-inflicted. *Id*. Second, around this same time, the university knew that the plaintiff had sent text messages to friends and his girlfriend stating that he intended to kill himself. *Id*. Finally, after police found the plaintiff in his room with bruises on his head, the university required the plaintiff to sign a statement that he would not hurt himself. *Id*. "Based on these alleged facts, a trier of fact could conclude that there was 'an imminent probability' that [the plaintiff] would try to hurt himself, and that the [university] had notice of this specific harm." *Id*. Here, by contrast, the latest Defendant had any knowledge of suicidal thoughts by Adams was, at the latest, sometime in the Spring of 2021. Accordingly, unlike the university in

---

[34] Notably, Plaintiffs do not cite any cases holding (or even suggesting) that a special relationship exists between a university and one of its students.

*Schieszler*, Defendant did not have information suggesting an "imminent probability" that Adams would try to hurt himself at the time he killed himself.[35]

Moreover, contrary to the district court's decision in *Schieszler*, both a federal district court in the Fifth Circuit and the Supreme Judicial Court of Massachusetts have declined to find that a university had a special relationship with an adult student so as to give rise to a duty to prevent the adult student's suicide. *See Williams v. Abilene Christian Univ.*, No. 1:20-CV-073-H, 2020 WL 10458627 (N.D. Tex. Dec. 14, 2020); *Dzung Duy Nguyen v. Massachusetts Inst. of Tech.*, 96 N.E.3d 128 (2018).[36]

For the reasons stated above, the Court finds that the Tennessee Supreme Court is unlikely to find it appropriate to impose an affirmative duty of care on Defendant based on the facts of this case. Accordingly, Plaintiffs cannot establish that Defendant owed Adams an affirmative (or "heightened") duty of care to prevent him from committing suicide.[37]

Therefore, Plaintiffs' wrongful-death negligence claim must be dismissed.

---

[35] The Court notes that the temporal focus in *Schieszler* is consistent with the approach applied by the Tennessee Supreme Court in *Cotten* insofar as both courts emphasize the degree of proximity of the time of the plaintiff's suicide to the time at which the defendant would have had notice of that suicide.

[36] Admittedly, there is room for distinction between the facts in the instant case and the facts in both *Williams* and *Ngyuen*. For example, in *Nguyen*, the court declined to find a special relationship because the student expressed no suicide plans or intentions, no suicide attempts occurred over a year before matriculation, and the student was an adult living off campus and seeking his own professional help. 96 N.E.3d at 146-47. Here, by contrast, Adams lived on campus and attempted suicide within a year of matriculation. But to the extent that dicta in *Williams* or *Ngyuen* suggests that those courts would have ruled differently given the precise facts presented in the instant case, such dicta does not necessarily indicate that the Tennessee Supreme Court would rule likewise given those facts.

[37] It is true that Defendant owed Adams a *standard* duty of care based on the facts alleged in the FAC. However, Plaintiffs have not alleged facts establishing that Defendant *breached* its standard duty of care because the standard duty of care—in the absence of a special relationship (which for reasons stated above, does not exist here)—does not include an affirmative duty to act. So in summary, Plaintiffs have not alleged facts to plausibly suggest either that Defendant owed Adams a "heightened" duty of care or that Defendant breached the (standard) duty of care that it did owe Adams.

III.   Count I: Premises-Liability Negligence

To state a claim for premises liability, a plaintiff must plead, in addition to the elements of negligence, that the property owner either caused or created a dangerous or unsafe condition on the property or had actual or constructive knowledge of the condition prior to the incident in question. *Blair v. West Town Mall*, 130 S.W.3d 761, 74 (Tenn. 2004). Plaintiffs' premises-liability claim fails for the same reasons its wrongful-death negligence claim fails. That is to say, because Plaintiffs have not alleged facts sufficient to state a claim for negligence, Plaintiffs cannot state a claim for premises-liability negligence (which requires all of the elements of negligence plus a dangerous or unsafe condition on the property).

But even if Plaintiffs had stated a claim for wrongful-death negligence, Plaintiffs would not be able to establish a claim for premises-liability negligence because—as Defendant points out—Plaintiffs have not identified a dangerous or unsafe condition. Plaintiffs insist that "the determination of an 'unsafe condition' depends upon whether there is a foreseeable risk of harm." (Doc. No. 32 at 12) (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). But Plaintiffs' argument is misguided. Plaintiffs' position is simply that where there is foreseeability of harm, there is likewise a dangerous or unsafe condition for purposes of a premises-liability claim. But this cannot be the case, as such a rule would eviscerate any distinction between a claim for negligence and a claim for premises-liability.

The FAC seeks to characterize several facts as creating a dangerous or unsafe "condition." Specifically, the FAC states that leaving Adams alone in his dorm room while increasing his workload when Defendant was aware of his previous suicide attempts and ongoing suicidal ideation "created a known dangerous condition." (Doc. No. 8 at ¶ 66). But the facts alleged in Paragraph 66, even if sufficient to create a foreseeable risk of harm, do not point to the type of

"condition" required to state a claim for premises liability. The "condition" generally must relate to a physical condition of the land or property, not circumstances or conduct (or a lack of conduct) creating a dangerous *situation* that merely *happens* to manifest itself on the premises at a particular juncture. *See Byrd v. State*, 150 S.W.3d 414, 419 (Tenn. Ct. App. 2004) (rejecting the plaintiff's assertion that sexual harassment by an employee on the defendant's property can constitute a "dangerous condition" under section 9–8–307(a)(1)(C)). Indeed, that is what makes this "premises" liability; it is liability for the condition *of the* premises*, not* for a condition of something that is on the premises.

Because Plaintiffs have failed to allege a specific physical condition of Defendant's the land or property that was dangerous or unsafe, Plaintiffs have failed to state a claim for premises liability.[38] Accordingly, Count II must be dismissed.

IV.    Count III: Discrimination in Violation of the ADA

Plaintiffs bring a claim for discrimination[39] under Title III of the ADA. Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). As suggested by this language, Title III is the part of the ADA that "relates to public accommodations and services operated by private entities." *Enyart v. Nat'l Conference of Bar Exam'rs, Inc., Inc.*, 630 F.3d 1153, 1160 (9th

---

[38] As noted above, even if Plaintiffs had alleged facts sufficient to establish the dangerous-or-unsafe-condition element, their premises-liability claim would still fail for the same reasons that their negligence claim fails.

[39] Though technically a claim for "discrimination" under Title III, Plaintiffs' claim in Count III is based on a theory of failure to accommodate. However, as discussed below, failure to accommodate can properly form the basis of a claim for what courts call "discrimination" under Title III even in the absence of discriminatory animus.

Cir. 2011). The ADA defines a "private entity" as "any entity other than a public entity," and defines a "public entity" as "any State or local government [or] any department, agency, . . . or other instrumentality of a State or States or local government." 42 U.S.C. §§ 12131(1), 12181(6). It appears undisputed for present purposes that Defendant is a "private entity" that "operate[s]" "public accommodations and services."

Title III's definition of "discrimination" includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities . . . ." 42 U.S.C. § 12182(b)(2)(A)(ii). Thus, under Title III, a plaintiff may bring a claim of "discrimination" (even in the absence of any discriminatory animus) under a theory of failure to accommodate.[40]

Generally, "[a] person alleging discrimination under Title III must show (1) that she is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally

---

[40] Plaintiffs purport to bring their Title III claim under both a theory of failure to accommodate and a theory of intentional discrimination (albeit in a single count). As stated above, a plaintiff need not show discriminatory animus (towards persons with the disability at issue or persons with disabilities in general) in order to establish discrimination under Title III of the ADA; instead, a plaintiff must show that the defendant failed to reasonably accommodate his or her disability (regardless of whether that failure was motivated by discriminatory animus against the plaintiff). Therefore, a showing of discriminatory animus is helpful only to the extent that it helps establish the failure to accommodate. So even where a plaintiff can show discriminatory animus on the part of a defendant, the plaintiff must still show that the defendant failed to accommodate the plaintiff's disability in some way, and such a showing does not require that the failure to accommodate was motivated by some discriminatory animus on the part of the defendant. Thus, Plaintiffs' allegations that Defendant intentionally discriminated against Adams are relevant to Plaintiffs' Title III claim only to the extent that those allegations suggest that Defendant failed to accommodate Adams's purported disability.

altering the nature of the public accommodation."[41] *Saenz v. LRC Restaurant Nashville, LLC*, No. 3:18-CV-01401, 2020 WL 758814, at *2 (M.D. Tenn. Feb. 14, 2020) (quoting *Abeyta v. Stonecrest Med. Ctr.*, No. 3:18-CV-0386, 2018 WL 3472820, at *3 (M.D. Tenn. July 18, 2018)).[42] Where, as here, a plaintiff's discrimination claim is based on the defendant's failure to accommodate the plaintiff's disability, the failure to accommodate itself satisfies the adverse action element. Therefore, under such circumstances, if a plaintiff establishes the fourth element (failure to accommodate) of a Title III claim for discrimination, he or she necessarily satisfies the third element (adverse action) as well. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1078, n.5 (8th Cir. 2006) (eliminating the third element (adverse action) from its rendition of the Title III discrimination standard because failure to accommodate was the only discriminatory act alleged by the plaintiff).

As to the first element, Plaintiffs have not plausibly alleged that Adams was a person with a "disability" within the meaning of the ADA. The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A). The FAC states that Adams "suffered from a recorded mental impairment and was regarded or perceived as having an impairment that qualifies as a 'disability' under 42

---

[41] The ADA refers to persons having a "disability," rather than to persons being "disabled." For this reason, and because the Court perceives that it is generally and appropriately considered more accurate and sensitive to refer to someone as merely *having* a condition (a disability) rather than *being* something ("disabled"), the Court endeavors to use the former rather than the latter phrasing. But given the terminology used by some of the courts quoted or otherwise cited herein, that is not always the best option, especially when quoting courts that use the term "disabled." In any event, the Court discerns (and intends to convey) no substantive conceptual distinction between having a disability and being disabled, and it uses the terms interchangeably.

[42] Regarding the second element, Defendant does not dispute that Defendant "owns, leases, or operates a place of public accommodation." 42 U.S.C. § 12182(a). Public accommodation" is defined within the ADA to include "postgraduate private school." 42 U.S.C. § 12181(7)(J).

U.S.C. § 12102." (Doc. No. 8 at ¶ 143). But this allegation merely states a legal conclusion, and conclusory allegations do not count towards the showing of plausibility required by *Twombly* and *Iqbal*. Plaintiffs do not actually articulate anywhere in the FAC the "mental impairment" from which Adams allegedly suffered. In one paragraph, the FAC alleges that Adams "began struggling with mental illness while attending Vanderbilt." (*Id*. at ¶ 21). But Plaintiffs never articulate any specific condition with which Adams was allegedly mentally ill. Mental illnesses of various sorts can certainly qualify as a disability under the ADA, *see* 29 C.F.R. § 1630.2(h)(2), but "where, as here, a party alleges that he or she is disabled under the ADA, courts have generally required the party to plead the disability with some factual specificity." *Bresaz v. Cnty. of Santa Clara,* 136 F. Supp. 3d 1125, 1136-37 (N.D. Cal. 2015) (citing *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1058 (9th Cir. 2007) (plaintiff adequately alleged a disability where he pled that he suffered from mental illness including "brain damage, and organic personality disorder"); *Puckett v. Park Place Entm't Corp*., 332 F.Supp.2d 1349, 1353 (D. Nev. 2004) (stating that the allegation that the plaintiff suffered from multiple sclerosis "[c]learly . . . qualifies as a physical impairment for purposes of the ADA"); *William S. v. Lassen Cnty*., 2006 WL 929398, at *3 (E.D. Cal. Apr. 11, 2006) (denying motion to dismiss ADA claim because even though the plaintiff failed to specifically allege how he was mentally or physically impaired, another of plaintiff's claims specified he was HIV positive); *Wingard v. Penn. State Police*, 2013 WL 3551109, at *5 (W.D. Pa. July 11, 2013) (denying motion to dismiss because "[w]hile it is not certain that [the plaintiff's] conditions will be proven to meet the stringent definition of a 'disability' under the ADA," the complaint nonetheless contained "allegations of depression leading to attempted suicide."); *Alejandro v. ST Micro Elec., Inc*., 2015 WL 5262102, at *3 (N.D. Cal. Sept. 9, 2015) ("Courts have held that a plaintiff must allege his disability with specificity to state a claim under the ADA.")). "As these

cases demonstrate, a successful plaintiff will usually allege that he or she suffered from a specific, recognized mental or physical illness. Here, on the other hand, the [F]AC contains no allegations that [Adams] suffered from a specific mental disorder or that [Adams] was ever medically diagnosed with having a specific mental disorder." *Bresaz*, 136 F. Supp. 3d at 1136.

The Court acknowledges that the cases cited above by the court in *Bresaz* relate to the level of specificity that courts have generally found *sufficient* (rather than *required*) to plead a disability under the ADA. Nevertheless, the court in *Bresaz* unmistakably suggests that those cases ought to be treated as indicating the level of specificity that is required. To reiterate, *Bresaz* states that "courts have generally required [a] party [alleging that he or she is disabled under the ADA] to plead the disability with some factual specificity." *Id.* at 1135-36; *see also id.* at 1136 ("[E]ven cases decided after the ADAAA's enactment appear to retain a similar specificity requirement."). And the Court agrees with *Bresaz* that the case law can be fairly read as requiring a party seeking to plead a disability under the ADA to allege a specific, recognized mental or physical illness. This makes perfect sense under the *Iqbal/Twombly* standards, under which an allegation that the plaintiff had a "disability" (as defined by the statute) must be supported by whatever quality or quantity of factual matter necessary to make that allegation plausible (and not merely conclusory).

Plaintiffs allege (repeatedly) that Adams had suicidal ideations, (Doc. No. 8 at ¶¶ 32-34, 37, 42, 44, 57-58, 60, 66, 73, 85, 99, 100-101, 105, 108), but Plaintiffs do not assert that suicidal ideation is a "mental illness" (rather than perhaps a symptom of Adams's undefined mental illness). Moreover, Plaintiffs cite no authority whatsoever stating that suicidal ideation is itself a mental impairment that would qualify as a disability under the ADA. To be sure, mental health conditions frequently associated with suicidal ideation—such as anxiety or depression—can qualify as a disability under the ADA. *See, e.g., Hentze v. CSX Transp., Inc.*, 477 F. Supp. 3d 644,

670 (S.D. Ohio 2020) (noting that general anxiety disorder can qualify as a disability under the ADA under certain circumstances); *Alderdice v. Am. Health Holding, Inc.*, 118 F. Supp. 2d 856, 864 (S.D. Ohio 2000), aff'd, 37 F. App'x 185 (6th Cir. 2002) (stating that depression is an "impairment" under the ADA that, under certain circumstances, could qualify as a disability under the ADA). But Plaintiffs have not alleged that Adams suffered from any such conditions (or, for that matter, from *any* condition more specific than "mental illness").[43]

Additionally, the FAC fails to plausibly allege that Adams's mental impairment—an unspecified mental illness—"substantially limits one or more of the major life activities" of an individual, as is required to meet the definition of "disability" under the ADA. 42 U.S.C. § 12131(2). Regulations implementing the ADA define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). The FAC does not plausibly allege that Adams's mental impairment "substantially limit[ed]" his ability to do any "major life activities."

Case law suggests that a mental impairment that causes someone to attempt (or complete) suicide "substantially limits" a major life activity (and therefore qualifies as a disability under the ADA) under the rationale that one who attempts suicide cannot be said to "care for oneself." *See, e.g., Chandler v. Specialty Tires of Am. (Tenn.), Inc.,* 134 F. App'x 921, 925–26 (6th Cir. 2005) (stating that a mental impairment "of which . . . attempted suicide was a symptom . . . would 'substantially limit' [a person] in the major life functions of caring for one's self, making reasonable decisions, and exercising sound thought and judgment"); *Pena Arita v. Cnty. of Starr, Texas*, No. 7:19-CV-00288, 2020 WL 5505929, at *4 (S.D. Tex. Sept. 11, 2020) (holding that a

---

[43] In one paragraph of the FAC, Plaintiffs allege that Adams's coursework "create[d] additional stress, pressure, and anxiety . . . ." (Doc. No. 8 at ¶ 104). But the Court does not construe this to be an allegation that Adams suffered from some type of anxiety *disorder* that could conceivably qualify as a disability under the ADA, and Plaintiffs do not argue for such a construction.

mental impairment causing suicidal ideation substantially impairs the ability to care for oneself and therefore can constitute a disability under the ADA).

However, in those cases the plaintiffs identified the specific mental impairment from which they allegedly suffered. In *Chandler*, the plaintiff suffered from depression. 134 F. App'x at 925. And in *Pena Arita*, the plaintiff suffered from a trauma-related mental disability and suicidal behavior disorder. 2020 WL 5505929 at *3. In addition, the plaintiffs in both cases tied their suicidal ideation to the specific mental condition from which they suffered. So in cases in which courts found that suicidal ideation qualifies as something that substantially limits the major life activity of caring for oneself, the plaintiffs alleged (in addition to an adequately defined mental impairment) causation between the specific mental impairment and the suicidal ideation. Here, however, the FAC fails to allege that Adams's mental impairment—an unspecified mental illness—caused his suicidal ideation. And because Adams's "mental illness" is undefined, the Court cannot even infer the necessary causation, especially since some mental illnesses are not specifically associated with suicidal ideation and suicidal ideation is not necessarily associated with any mental illness.[44] Therefore, the fact that Adams attempted and committed suicide (and had suicidal ideation) is not sufficient to establish that his mental impairment "substantially

---

[44] For example, the First Century historian Flavius Josephus recounted the story of the mass suicide of the defenders of the besieged fortress at Masada, whose suicide clearly can be viewed as resulting not in any way from mental illness but rather from an entirely rational choice not to end up slaughtered on enslaved by the besieging Romans. The Court does not mean to suggest that Adams's suicide bears any similarity whatsoever to that historical episode, that Adams's suicide in fact was the result of a rational choice rather than of some mental illness, or that Adams's suicide was anything other than a tragedy. Rather, the Court means only to denote and enforce the pleading requirement that the plaintiff allege factual matter plausibly suggesting (even if only by inference) that an impairment substantially limits (*i.e.*, causes some substantial limitation on) a major life activity—meaning, in this case, that a mental impairment was causally linked to suicidal ideation (which in turn is equated by courts with a substantial limitation on a major life activity). In Adams's case, such a suggestion may have been very plausible, but Plaintiffs did not allege factual matter to support it, either expressly or by inference.

limit[ed]" his ability to do any of "major life activities." Accordingly, the Court finds that Plaintiffs have not plausibly alleged that Adams suffered from a disability under the ADA.

Even if Plaintiffs had alleged facts sufficient to establish a disability under the ADA, Plaintiffs have failed to allege facts sufficient to establish a claim for discrimination based on failure to accommodate because Plaintiffs have made no allegation that Adams ever requested an accommodation for his alleged disability (whatever that disability might be). A plaintiff seeking to establish discrimination based on a failure-to-accommodate theory must show that he or she made a request for reasonable accommodation that the defendant denied. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007) ("Generally, an ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444 (6th Cir. 2004))). Most of the case law discussing the requirement that a plaintiff request an accommodation (and, indeed, all of the case law relied on by Defendant on this issue) comes from Title II cases. However, as discussed below, the case law suggests that this requirement (that a plaintiff make a request for reasonable accommodation) likewise applies in Title III cases, and this is particularly true for Title III claims asserted against educational institutions, like Defendant.

"An educational institution 'is not required to provide accommodation to a student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation.'" *Allen v. Middle Tenn. Sch. of Anesthesia, Inc.*, No. 3:20-CV-00903, 2022 WL 10551094, at *7 (M.D. Tenn. Oct. 18, 2022) (quoting *Newell v. Cent. Mich. Univ. Bd. of Trustees*, No. 20-1864, 2021 WL 3929220, at *8 (6th Cir. Sept. 2, 2021)); *see Mershon,* 442 F.3d at 1077 (stating that the plaintiff, who brought a failure-to-

accommodate claim under Title III, "bears the initial burden of demonstrating that he requested reasonable accommodations").

As Judge Trauger noted on this issue,

> The requirement, under Title III, that the plaintiff request an accommodation is similar, at least in its broad strokes, to the requirement, in employment-based ADA claims, that the disabled employee "must initiate the interactive process" of evaluating whether a reasonable accommodation is possible. *Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428, 434 (6th Cir. 2017) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)). The court will therefore consider caselaw on that issue as instructive, alongside Title III caselaw that is directly on point.

*Allen*, 2022 WL 10551094, at *7, n.5.

This Court agrees with Judge Trauger that case law from employment-based ADA claims is properly considered as instructive in a case like this. And that case law instructs that while a person with a disability "need not use the magic words 'accommodation' or even 'disability'" in order to be entitled to consideration of the requested accommodation, *Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)), he or she must take *some* initiative to seek a reasonable accommodation, and it must be "clear from the context that [the request] is being made in order to conform with existing medical restrictions." *Id.* "'What matters under the ADA,' at least with regard to the initial notice of a disability and the request for accommodation, 'are not formalisms about the manner of the request, but whether the [person with a disability] provides the [regulated entity] with enough information that, under the circumstances, the [entity] can be fairly said to know of both the disability and desire for an accommodation.'" *Allen*, 2022 WL 10551094, at *7 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)) (emphasis added).

Here, there are no allegations in the FAC suggesting that Adams requested any accommodation to help with his alleged disability. Adams did not request for example, additional

time to complete his schoolwork, the assignment of a roommate, or access to additional counseling. The FAC does not even allege that Adams communicated his alleged disability (let alone requested an accommodation, reasonable or otherwise, because of his disability) to anyone other than the UCC therapist(s) with whom he met.

Plaintiffs argue that there is no obligation for a person with a disability to make a request for an accommodation when the allegations "involve a defendant's indifference to an open and obvious mental condition." (Doc. No. 32 at 23). They rely on two cases for this proposition, neither of which is binding or persuasive. The first is an out-of-circuit, district court case in which the court acknowledged in passing that "[t]he 'open, obvious, and apparent' standard is a 'narrow exception' to 'the generally applicable rule that [i]f the [plaintiff] fails to request an accommodation, the [public entity] cannot be held liable for failing to provide one.'" *Doe v. Texas A&M Univ.*, 634 F. Supp. 3d 365, 380 (S.D. Tex. 2022) (quoting *Windham v. Harris Cnty.*, 875 F.3d 229, 239 (5th Cir. 2017) (internal citations omitted)). However, the language from *Texas A&M* on which Plaintiffs rely was mere dicta (as well as being non-binding on this Court, of course).[45] Moreover, the "narrow exception" to which the district court in *Texas A&M* referred was fully articulated by the Fifth Circuit as follows: "[w]hen a plaintiff fails to request an accommodation [in direct and specific terms], he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Windham*, 875 F.3d at 237 (quoting *Taylor v. Principal Financial Grp., Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. denied*, 519 U.S. 1029 (1996)). It is clear from the

---

[45] The plaintiffs in *Texas A&M* made specific requests for accommodations on several occasions. *See Texas A&M Univ.*, 634 F. Supp. 3d at 381 ("Plaintiffs have alleged facts that are capable of establishing that TAMU received direct and specific requests that A.T. receive reasonable accommodations for her disabilities on at least three occasions.").

Fifth Circuit's articulation of this exception that for this exception to apply, it is not enough that a plaintiff's *disability* be "open, obvious, and apparent" to the defendant; rather, any limitations resulting from that disability and necessary reasonable accommodations designed to assist with the disability must also be "open, obvious, and apparent" to the defendant.

Here, Plaintiffs seems to argue that because Defendant knew that Adams had suicidal ideation and previously attempted suicide, his mental impairment—whatever exactly that might be—was a disability that was "open, obvious, and apparent" to Defendant. But Adams's alleged mental impairment—even if a "disability" under the ADA[46]—is not the type of disability that would qualify as being "open, obvious, and apparent" under the case law on which Plaintiffs rely. Rather, as the Fifth Circuit has acknowledged, the exception is more suitable to "well-understood and outwardly visible disabilities like, say, blindness, deafness, or being wheelchair-bound." *Windham*, 875 F.3d at 239 (citing *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1198 (10th Cir. 2007)). And even assuming arguendo that Adams's mental disability *was* "open, obvious, and apparent" to Defendant, Plaintiffs have not plausibly alleged that the *limitations* resulting from Adams's disability or the *accommodations* he would necessarily require—whatever those might be—were likewise "open, obvious, and apparent" to Defendant. The Fifth Circuit itself has acknowledged that making such a showing would be difficult with respect to a mental disability. *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio,* 633 F. App'x 214, 216 (5th Cir. 2015) ("As we explained in *Taylor*, '[w]hen dealing in the amorphous world of mental disability,' it will often be impossible for an employer to identify an employee's specific

---

[46] As explained above, Plaintiffs have not plausibly alleged that Adams suffered from any disability under the ADA because Plaintiffs have not even articulated what the "mental impairment" was that Adams purportedly suffered from. However, for purposes of the Court's analysis regarding Plaintiffs' "open, obvious, and apparent" exception argument, the Court assumes arguendo that Adams suffered from some mental health impairment that could qualify as a disability.

disabilities, limitations, and possible accommodations." (quoting *Taylor*, 93 F.3d at 165)). Therefore, even if the Court were willing to endorse the "narrow exception" recognized in the Fifth Circuit, it would not be applicable to facts presented in this case.

The second case on which Plaintiffs rely for their proposed "open and obvious mental condition" exception, *Abeyta v. Stonecrest Med. Ctr.,* is an unpublished case in which it is unclear whether the plaintiff requested an accommodation. No. 3:18-CV-0386, 2018 WL 3472820 (M.D. Tenn. July 18, 2018). In *Abetya*, the court summarized the plaintiff's complaint as alleging that "the hospital discriminated against [the plaintiff] on the basis of a disability by 'failing to grant her a reasonable accommodation of waiving its requirement of removal of all clothing, despite Plaintiff's willingness to communicate and share about the nature of why [she] and [her] Care helper decided to arrive at the Hospital.'" *Abeyta*, 2018 WL 3472820 at *2. It is not clear from these facts (or from the remainder of the opinion) whether the plaintiff asked for (and was denied) a reasonable accommodation, or whether the plaintiff never even asked for any such accommodation. Accordingly, even assuming arguendo that Adams's mental impairment could be characterized as "open and obvious," the Court is not persuaded by the (non-binding) legal authority provided by Plaintiffs that Adams would have been excused from making a request for accommodation. The Court therefore rejects this argument.

Additionally, the fact that Defendant was aware of Adams's disability via his interactions with a UCC therapist does not excuse Adams from failing to request an accommodation. In *Allen*, the Court concluded that the plaintiff, a student, could not establish that he had made a request for accommodation from the mere fact that he told his instructors about his disability (ADHD) and discussed difficulties he was having with the program. 2022 WL 10551094, at *8. Because the plaintiff could not "point to any particular communication in which he clearly requested an

accommodation to deal with a symptom of his medical condition," he failed to make a request for accommodation. *Id. Cf. Carney v. Univ. of Akron*, No. 5:15CV2309, 2016 WL 4036726 (N.D. Ohio July 28, 2016) (holding in case under Title II of the ADA that the student plaintiff did not adequately allege the triggering of the university defendant's duty to offer an accommodation merely because she received treatment at the defendant's counseling center, where there [we]re no allegations that she received a diagnosis from the counselling center, released any diagnosis to [defendant's] officials, or requested a specific accommodation during these sessions or thereafter.").

Because Plaintiffs have failed to allege that Adams made a request for reasonable accommodation, Plaintiffs' Title III claim for discrimination under a failure-to-accommodate theory must be dismissed.

V.     Count IV: Discrimination in Violation of the Rehabilitation Act

Plaintiffs claim that Defendant intentionally discriminated against Adams in violation of the Section 504 of the Rehabilitation Act (the "Act"). Section 504 of the Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." "Apart from [§ 504's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes [*i.e.*, the Act and the ADA] are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008) (citing *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)). For this reason, "[c]laims brought under the Rehabilitation Act are generally reviewed under the same

standards that govern ADA claims."[47] *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)).

Accordingly, the Court's analysis of Plaintiffs' ADA claim is equally applicable to Plaintiffs' claim under Section 504. So just as Plaintiffs failed to plausibly allege that Adams had a "disability" under the ADA, they have likewise failed to plausibly allege that Adams had a "disability" under the Act.

Plaintiffs' Section 504 discrimination claim requires additional analysis, however, based on arguments Plaintiffs make specific to that claim. Plaintiffs argue that Section 504 discrimination claims can be brought based on a theory of either intentional discrimination or failure to reasonably accommodate, and that only claims brought under the latter theory require a request for accommodation. (Doc. No. 32 at 26) (citing *Knox Cnty., Tenn. v. M.Q.*, 62 F.4th 978 (6th Cir. 2023)). Moreover, Plaintiffs assert that under the Act, intentional discrimination can be inferred from a defendant's deliberate indifference to the plaintiff's disability. (Doc. No. 32 at 24) (citing *Hill v. Bradley Cnty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008)). Based on this interpretation of the law, Plaintiffs argue that they have stated a discrimination claim under Section 504 (based on an intentional-discrimination theory) by alleging facts showing that Defendant was deliberately indifferent to Adams's disability, and that this is sufficient to state a claim even if no discriminatory animus or request for accommodation has been alleged. (Doc. No. 32 at 25-26).

---

[47] Specifically, a discrimination claim under Section 504 (which uses now-outdated terms for a disability and a person with a disability) requires a plaintiff to show: "(1) the plaintiff is a 'handicapped' person under the Act; (2) the plaintiff is otherwise qualified for participation in the program at issue; (3) the plaintiff is 'excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap;' and (4) the relevant program or activity is receiving Federal financial assistance." *Hill v. Bradley Cnty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008) (quoting *Maddox v. U. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 314 (6th Cir. 2012)). The primary issues for purposes of the instant Motion are the first and third elements.

But Plaintiffs' understanding of the law is simply incorrect. First, even assuming arguendo that *Knox* does stand for the proposition that a plaintiff may bring a Section 504 discrimination claim based on a theory of intentional discrimination without showing that the defendant failed to accommodate the plaintiff's disability,[48] a plaintiff would still be required to show discriminatory animus. *Knox*, 62 F. 4th at 1000 ("An intentional discrimination claim lies where the defendant treated someone less favorably on account of his disability; '[p]roof of discriminatory motive is critical'" (quoting *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 311 (2d Cir. 2020))). And Plaintiffs have not plausibly alleged that Defendant's conduct (*i.e.*, failing Adams's courses, increasing his workload, and failing to provide him full and equal access to housing services, facilities, and accommodations) was motivated by discriminatory animus towards Adams's alleged disability. Plaintiffs do not plausibly allege, for example, that Defendant increased Adams's workload *because* he had a disability. Nor do Plaintiffs plausibly allege that Defendant discriminated against Adams by denying him, *because* of his disability, housing services that were provided to students without the same disability. Rather, Plaintiffs summarily conclude that Defendant's conduct "not only had the effect of discriminating against . . . Adams . . ., but intentionally discriminated against [him] . . . ." (Doc. No. 8 at ¶ 152).

Perhaps in recognition of their failure to plausibly allege discriminatory animus, Plaintiffs seek to circumvent this requirement by arguing that intent to discriminate can be inferred from

---

[48] Plaintiffs cite *Knox* (without providing a pinpoint cite) as support for the proposition that a plaintiff is "not required to allege [that he or she] made a specific request for an accommodation when claiming intentional discrimination based on upon a known and obvious disability." (Doc. No. 32 at 26). It is true that *Knox* acknowledged with respect to Section 504 (and the ADA generally) that "[a] plaintiff may allege disability discrimination under two available theories: intentional discrimination and failure to reasonably accommodate." *Knox*, 62 F.4th at 1000. In *Knox*, the Sixth Circuit also stated that "[a]n intentional discrimination claim lies where the defendant treated someone less favorably on account of his disability." *Id*. The Court acknowledges that one could conceivably "treat someone less favorable on account of his disability" even in the absence of a request for accommodation. Accordingly, the Court accepts Plaintiffs' reading of *Knox* for purposes of deciding the instant Motion.

deliberate indifference. But this argument is likewise unavailing. Contrary to Plaintiffs' assertions, the Sixth Circuit has not clearly held that intentional discrimination can be inferred from a defendant's deliberate indifference. Rather, the Sixth Circuit has *assumed,* in cases in which the parties agreed that intentional discrimination can be inferred from deliberate indifference, that such an inference may be drawn. *See Douglas v. Muzzin*, No. 21-2801, 2022 WL 3088240, at *8 (6th Cir. Aug. 3, 2022) (noting that prior cases "have also assumed that a showing of deliberate indifference suffices to prove" intent to discriminate deciding to follow those decisions); *Hill*, 295 F. App'x at *742, n.2 ("Because the parties agree on the law, we accept this interpretation [that, under Section 504, intent to discriminate may be inferred from deliberate indifference to a strong likelihood that pursuit of certain policies will result in a violation of protected rights] without deciding the level of requisite intent").

And even assuming arguendo that for Section 504 claims intent to discriminate can be inferred from deliberate indifference, that does a plaintiff no good unless the plaintiff alleges facts sufficient to plausibly suggest deliberate indifference. A plaintiff relying on such an inference must make such allegations. And to do that, the plaintiff must allege that he or she requested an accommodation. As the Sixth Circuit stated in *Douglas*, "the deliberate-indifference standard 'requir[es] both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood.'" 2022 WL 3088240, at *8 (quoting *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cnty., Ky.*, 637 F. App'x 922, 926 (6th Cir. 2016) (Moore, J., concurring in part and dissenting in part)). The requisite knowledge required to establish this first prong of deliberate indifference "is shown '[w]hen the plaintiff has alerted the public entity to his need for

accommodation.'"[49] *Id*. (quoting *R.K.,* 637 F. App'x at 926). So where a defendant ignores a plaintiff's request for an accommodation that is necessary and reasonable, a court may infer that the defendant was deliberately indifferent to the plaintiff's disability. For example, in *Biondo v. Kaledia Health*, the plaintiff and her family alerted the defendant (a hospital) of her need for accommodation by repeatedly asking staff nurses for an American Sign Language (ASL) interpreter. 935 F.3d 68, 74, 75 (2d Cir. 2019). Despite her repeated requests, the plaintiff (who was deaf) did not receive an ASL interpreter. *Id*. at 75. The Second Circuit found that the nurses' failure to respond to the plaintiff's repeated requests (despite having the authority to call for an interpreter) could support an inference that the nurses had "actual knowledge" of potential discrimination against the plaintiff and that they were deliberately indifferent to a potential violation of the Act. *Id*. at 74-75. And from that deliberate indifference, intentional discrimination could be inferred.

Similarly, in *Douglas*, the plaintiff requested an accommodation by presenting to the defendant a "Special Accommodation Notice," which alerted the defendant to the plaintiff's need for accommodation. 2022 WL 3088240, at *8. In light of the defendant's refusal to honor the plaintiff's request for accommodation,[50] the court concluded that the defendant could be charged with deliberate indifference because the defendant "had knowledge that a harm to a federally protected right was substantially likely and failed to act upon that likelihood by not honoring the requested accommodation." *Id*. at *9 (internal citations omitted).

---

[49] The case law further suggests that in order to establish deliberate indifference, the plaintiff must show that the accommodation sought by the plaintiff is necessary and reasonable. *Douglas*, 2022 WL 3088240, at *8 ("[To prove deliberate indifference,] "it is enough that a plaintiff has given the public entity the information necessary to understand the need for and reasonableness of the requested accommodation." (quoting *R.K.,* 637 F. App'x at 926 (Moore, J., concurring in part and dissenting in part))).

[50] The court in *Douglas* found evidence supporting the inference that the requested accommodation was needed and reasonable. *Id*. at *11.

The upshot of these cases is that the deliberate indifference standard requires a plaintiff to show that he (1) made a request for (2) a necessary accommodation that was (3) reasonable. Here, Plaintiffs have not even plausibly alleged that Adams made a request for an accommodation, much less that the (unrequested) accommodation was necessary or reasonable. Although the FAC alleges facts to support the notion that Defendant was aware of Adams's "mental impairment," the FAC does not contain facts suggesting that Adams asked Defendant to make any accommodation in light of his alleged disability. And without such a request, the Court cannot assess whether the requested accommodation was needed or reasonable. Thus, even if intentional discrimination can be inferred from deliberate indifference for claims under Section 504, Plaintiffs have not alleged facts sufficient to draw that inference in this particular case (*i.e.*, facts sufficient to plausibly suggest deliberate indifference as properly understood).

Accordingly, Plaintiffs' claim for discrimination under Section 504 of the Act must be dismissed.

VI.    <u>Count V: Breach of Contract</u>

To allege a breach of contract under Tennessee law, a plaintiff must plead (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breach. *Thomas v. Meharry Med. Coll.*, 1 F.Supp.3d 816, 828 (M.D. Tenn. 2014). A contract can be either express or implied. *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990).

Regarding the nature of contracts in the context of a student-university relationship, the undersigned has previously observed:

> When applying Tennessee law, the Sixth Circuit has stated that "the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area." *Sifuna v. S. Coll. of Tennessee, Inc.*, No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018) (quoting *Doherty v. S.*

*Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). The Tennessee Supreme Court has not identified a standard to apply when a dispute arises out of a university/student relationship, but the Sixth Circuit has stated that it believes that the Tennessee Supreme Court would apply a deferential standard of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doherty*, 862 F.2d at 577 (quoting *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977)); *Anderson*, 450 F. App'x at 502 (noting the likely applicability of this standard to an implied contract).

*Evans v. Vanderbilt Univ. Sch. of Med.*, 589 F. Supp. 3d 870, 892 (M.D. Tenn. 2022).[51] Plaintiffs allege that Defendant has breached both an express contract and an implied contract.

A.    **Express Contract**

Plaintiffs assert that "valid and enforceable contracts exist between [Defendant] and Plaintiffs regarding [Adams's] enrollment and attendance at [Defendant], his housing provided by [Defendant], and the services [Adams] received through the UCC at [Defendant]." (Doc. No. 32 at 26-27) (citing Doc. No. 8 at ¶¶ 173-75). Specifically, the FAC includes the following allegations:

> 173. Vanderbilt and Mr. Adams had a valid and enforceable contract based upon Mr. Adams' payment of significant tuition fees for enrollment as a student and Vanderbilt's provision of instruction, housing, food and access to all amenities, activities, and programs available for students enrolled at the university.
>
> 174. Upon information and belief, Mr. Adams and Vanderbilt executed valid and enforceable agreements obligating Vanderbilt to provide Mr. Adams equal access to all its programs and activities.
>
> 175. Mr. Adams and Vanderbilt had valid and enforceable agreements regarding Mr. Adams residing on campus as a condition of his enrollment at Vanderbilt and Vanderbilt, upon information and belief, made material representations to Mr. Adams, and to Mr. Adams' parents, regarding the care and services it would provide to Mr. Adams while residing on campus in return for the consideration provided by Mr. Adams and his parents for Mr. Adams to attend and matriculate from Vanderbilt.

---

[51] One may reasonably ask what the practical difference is between a "rigid" application of contract law and a non-"rigid" application of contract law, but the Court need not answer that question with precision here.

(Doc. No. 8 at ¶¶ 173-75). Plaintiffs argue that these allegations are sufficient to create a reasonable inference that an express contract exists between the parties. (Doc. No. 32 at 27).

Defendant responds by arguing that no express contract has been alleged to exist and that, even if a contract did exist, Plaintiffs have failed to identify which obligations [Defendant] has breached, rendering Plaintiffs' allegations conclusory and "insufficient to meet the standard of pleading 'factual matter suggesting an express contract.'" (Doc. No. 37 at 6).

The Court agrees with Defendant that Plaintiffs have failed to state a claim for breach of an express contract because the FAC lacks factual matter suggesting the existence of an express contract. Merely stating that "valid and enforceable agreements" between the parties exist, (Doc. No. 8 at ¶ 173-75; 178), without pointing to specific contractual provisions (or, for that matter, facts about the nature, origin, or memorialization of the contract at its most basic level), offers nothing more than a legal conclusion or "threadbare recitals of the [first] element[ ] of a cause of action [for breach of contract]." *Iqbal*, 556 U.S. at 678. These "do not suffice," *id.*, as "conclusory allegations do not count towards the showing of plausibility required by *Twombly* and *Iqbal*." *Evans*, 589 F. Supp. 3d, at 894. "Plaintiff[s] needed to allege factual matter suggesting an express contract but failed to do so." *Evans*, 589 F. Supp. 3d. at 894.

Therefore, the Court finds that Plaintiffs have not adequately alleged that an express contract exists between the parties.

### B.    **Implied Contract**

The Sixth Circuit has stated that "the student-university relationship is contractual in nature." *See Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005) (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570 (6th Cir. 1988)); *see also Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 890 (M.D. Tenn. 2018) ("*Doe II*") ("Generally speaking, this [student-university

contractual] relationship is implied as opposed to express.") (citing *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011)). Catalogs, manuals, handbooks, bulletins, circulars and regulations of a university may help define this contractual relationship. *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992).

Plaintiffs have adequately alleged that the student-university relationship between Adams and Defendant creates an implied contract. (Doc. No. 8 at ¶ 173). However, Plaintiffs have not alleged facts sufficient to state a claim that Defendant breached any implied contract. Plaintiffs allege that Defendant breached their contractual commitment to Adams by failing to: (1) afford Adams access to all of Defendant's activities and programs, (2) provide Adams with suitable housing, (3) accommodate Adams's disability, and (4) exercise ordinary care for Adams. (Doc. No. 8 at ¶¶ 177–78). But as Defendant points out, this Court has previously held that a plaintiff could not state a claim for breach of an implied contract without "point[ing] the Court to any guiding document of [the d]efendants, such as the Handbook or a policy manual, that includes terms that [the d]efendants allegedly breached by failing to do these things." *Evans*, 589 F. Supp. at 895.

Here, Plaintiffs do not identify (in the FAC or, for that matter for what it may have been worth, in their Response) any document that would arguably require Defendant to affirmatively engage in the conduct that allegedly constitutes a breach. Plaintiffs do not point, for example, to a handbook of Defendant's that would require Defendant to "accommodate Adams's disability."

Because Plaintiffs have not alleged facts establishing the existence of any express contract, and because they have not alleged facts establishing that Defendant breached the implied contract created by the student-university relationship, Plaintiffs have failed to state a claim for breach of

contract. Accordingly, Defendant's Motion will be granted as to Plaintiffs' breach-of-contract claim.

CONCLUSION

The Court does not begrudge Plaintiffs their views about who is responsible for their son's tragic death, and they are more than entitled to their opinion in that regard. And the Court well recognizes that this case is only at the motion-to-dismiss stage. But a claim must meet certain standards under *Iqbal/Twombly* and/or Rule 9(b) to survive past that stage, and in particular under *Iqbal* it needs to allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable . . . ." *Iqbal*, 556 U.S. at 663. For the reasons discussed herein, the Court finds that none of Plaintiffs' claims accomplish that. Accordingly, the Motion (Doc. No. 24) will be GRANTED, and the FAC (Doc. No. 8) will be dismissed in its entirety.

An appropriate corresponding order will be entered.

_____
ELI  RICHARDSON
UNITED STATES DISTRICT JUDGE